**McCLURE, Appellant and Cross–Appellee,**

v.

**McCLURE, Appellee and Cross–Appellant.**

[Cite as *McClure v. McClure* (1994), 98 Ohio App.3d 27.]

Court of Appeals of Ohio,
Greene County.

No. 93 CA 79.

Decided Oct. 5, 1994.

30

*Robert D. McClure*, pro se.

*Paul W. Barrett*, for appellee and cross-appellant.

---

WOLFF, Judge.

Robert D. McClure ("Doug") appeals from the judgment of the Greene County Court of Common Pleas which granted him and Karen S. McClure a divorce. Karen filed a cross-appeal.

A brief statement of the facts follows.

Doug and Karen were married in Minot, North Dakota, on November 4, 1983. At the time of the marriage, Karen had two children, Angela and Joshua, from a previous marriage. Doug adopted Angela and Joshua. Six months into the marriage, Karen gave birth to another daughter, Alexis. Until recently, the parties did not dispute that Doug was Alexis' father.

For approximately the first year of their marriage, Karen, Doug, and the children lived in the house Doug had purchased previous to the marriage. Doug was then transferred to McClellan Air Force Base in Sacramento, California, and Karen and Doug bought a house in Sacramento. In September 1988, the McClures moved to Beavercreek, Ohio. They rented a house for a period of time and, after selling the house in California, they were able to buy a house in Beavercreek.

On May 24, 1992, Doug was arrested for domestic violence for attempting to prevent Angela from leaving the house. An order was issued requiring him to vacate the house in Beavercreek. Doug established a separate residence and never resumed residency in the marital home.

On May 28, 1992, Doug filed a complaint for divorce. Karen filed a counter-claim for divorce. Temporary orders were issued requiring Doug to pay child support and Karen's housing expenses.

On August 3, 1992, Doug was given an ultimatum from the Air Force to accept a voluntary separation or be involuntarily discharged. Doug chose to resign, and he qualified for and began to receive the Voluntary Separation Incentive ("VSI") package offered by the Armed Forces to encourage a reduction in force. Doug has not yet obtained new employment. The VSI pays Doug $17,400 annually in a lump sum on his resignation date.

Upon Doug's motion, the amount of child support was reduced. Temporary spousal support was discontinued.

A hearing was held on June 11, 1993. On September 2, 1993, the trial court filed a "Decision on Divorce," which ordered Doug to prepare and present a final

decree in accordance with the decision. On September 21, 1993, Doug filed a motion requesting DNA testing of Doug, Karen, and Alexis to determine the paternity of Alexis. On October 15, 1993, the trial court entered its final judgment and decree of divorce, which was identical in all substantial respects to its September 2 decision. The September 21 motion for DNA testing was not addressed by the trial court.

The final judgment and decree of divorce awarded custody of Alexis and Angela to Karen. Custody of Joshua was not at issue because he was emancipated at the time of the divorce. Doug did not request visitation with Angela. The decree reflected the agreement of counsel at the June 11 hearing that Doug may be granted visitation with Alexis in the future upon the finding of Doug's physician that visitation would be appropriate. The decree ordered Doug to continue to pay $167.50 per child per month until Alexis and Angela are emancipated. The court directed that the child support payments be made out of Doug's VSI directly from the Air Force to the Greene County Child Support Enforcement Agency.

The decree also ordered Doug to pay rehabilitative spousal support to Karen in the amount of $400 per month for two years. The court found this award to be reasonable and appropriate to assist Karen as she attempted to continue her education. The spousal support was to be paid directly from Doug's VSI payment to Karen.

Additionally, the trial court ordered that Doug was entitled to $1,600 from the proceeds of the sale of the marital residence as separate property to compensate him for his equity in the house in Minot, which Doug had purchased prior to the marriage. The court also determined that Doug's VSI payments were his separate property not subject to division.

On appeal, Doug asserts six assignments of error, and Karen asserts four. We will first consider Doug's assignments of error and then address Karen's cross-assignments of error.

## SUMMARIZED FIRST ASSIGNMENT OF ERROR

"The trial court erred in denying Doug McClure visitation with Alexis McClure."

In support of this assignment of error, Doug contends that (1) he did not agree to restrict his right to visitation, (2) no mediation report was filed with the trial court, (3) the decision to deny him visitation with Alexis was contrary to the medical evidence, (4) the court violated Civ.R. 60(B), (5) the court violated Civ.R. 75, and (6) the trial court failed to state its findings of fact and conclusions of law.

Doug argues that the agreement among the attorneys regarding his waiver of his right to visitation did not reflect his position. Rather, Doug asserts that the agreement reflected only the attorneys' perceptions of his mental state.

At the conclusion of the June 11 hearing, the following discussion took place:

"Doug's Attorney:

"One other matter, Your Honor, and that is the matter of visitation, Mr. McClure, with [Alexis], and that is the deposition of Dr. Moon, which was submitted indicates that supervised visitation is okay. * * * And Rebecca Rubin, when she filed her supplemental report with the Court, said that supervised visitation is okay.

"Once we work out Mr. McClure's problems we ask only that the Court * * * retain jurisdiction over the matter of visitation with the children. And when the medical people line up and Mr. McClure straightens around the problems he has with the State of Ohio and everything kind of falls back into line, we come back to you and ask for visitation of some type.

"Karen's Attorney: Not a problem. We think that's proper.

"The Court: You're agreed on that so I will make no further decision other than the court will retain jurisdiction on any ruling as to permanent visitation."

The decree of divorce stated, in pertinent part, as follows:

"By agreement between the parties, visitation with Alexis may be granted, upon a Court hearing, to the Plaintiff/Father at some future date upon the finding by the Plaintiff's treating physician that visitation would be appropriate."

■ Doug was present in the courtroom when the attorneys entered into the agreement regarding visitation with Alexis. Doug did not object to this agreement from June 11 through the date of the decree, October 15. There is nothing in the record to support Doug's contention that he did not consent to the agreement entered by his attorney. Accordingly, the trial court did not abuse its discretion in entering judgment in accordance with the apparent agreement of the parties.

■ Doug also contends that the trial court erred in failing to consider a mediation report. He relies on R.C. 3109.051, which states that "the court shall consider any mediation report filed pursuant to 3109.052 of the Revised Code." Although, as Doug argues, the word "shall" indicates that the provision is mandatory, the provision becomes mandatory only if a mediation report is filed. No mediation report was filed in this case, and there is no indication that any mediation occurred. Thus, the trial court could not have erred by failing to consider a mediation report.

■ Doug argues that the trial court erred in denying him visitation because his personal physician, Dr. Moon, expressed the opinion that supervised visitation would be appropriate. By acquiescing to the agreement not to grant him visitation, Doug waived his right to have the court determine the propriety of visitation based upon the evidence. Moreover, the trial court was not bound to adopt Dr. Moon's opinion as to the appropriateness of Doug's visitation with Alexis. Dr. Moon diagnosed Doug with major depression, post-traumatic stress disorder, and multiple personality disorders. He further testified that Doug's prognosis was fair and that he required continuing psychiatric treatment. Dr. Moon stated the post-traumatic stress disorder and the personality disorders could be lifelong problems for Doug. In light of this testimony, the trial court would not have abused its discretion in denying Doug visitation with Alexis even if Doug had not agreed to waive his visitation.

The next arguments Doug asserts are that the trial court violated Civ.R. 60(B) and Civ.R. 75. Doug did not move to vacate the judgment of the trial court. Accordingly, the trial court was never called upon to consider Civ.R. 60(B) and could not have violated that rule. Doug argues that Civ.R. 75(L) was violated because "no credible evidence was entered before the trial court to preclude denial of child visitations." To the contrary, Dr. Moon's testimony, as described above, supported the trial court's decision not to grant visitation.

Finally, Doug asserts that the trial court erred by failing to state its findings of fact and conclusions of law. In support of this argument, Doug contends that the trial court failed to answer his "motions for facts and findings," which he filed on May 14, 1993 and July 7, 1993. However, these motions did not refer to the court's decision on visitation; rather, they addressed alleged omissions in the transcript of a February 16, 1993 hearing.

■ R.C. 3109.051 requires a court to journalize its findings of fact and conclusions of law, when the court determines that it would not be in the best interest of a child to permit a parent to visit the child. The trial court's "Decision on Divorce" and its "Final Judgment and Decree of Divorce" were sufficient to constitute a statement of the court's findings of facts and conclusions of law in this case. Additionally, by agreeing to waive his right to visitation, Doug waived his right to a statement of the court's findings of fact and conclusions of law.

For the foregoing reasons, Doug's first assignment of error is overruled.

## SUMMARIZED SECOND ASSIGNMENT OF ERROR

"The trial court erred in failing to order genetic testing to determine paternity before entering final judgment."

In this assignment of error, Doug argues that the trial court erred by not ordering DNA testing upon his motion. Karen responds to this argument by asserting that the paternity of Alexis was settled in the decree because Doug's complaint stated that Alexis was born issue of the marriage, Karen's answer admitted that allegation, and the decree stated that Alexis was born issue of the marriage. Karen contends that Doug did not file a motion for genetic testing until December 16, 1993, after the decree was entered. However, our review of the record revealed that on September 21, 1993, more than three weeks before the decree was entered, Doug filed a motion "to require the Plaintiff, Defendant and parties' minor child, Alexis, to submit to DNA testing to determine the paternity of Alexis."

The procedure to obtain an order for testing to determine paternity is set forth in R.C. 3111.08. This section provides in pertinent part as follows:

"(B) If an action is brought against a person to declare the existence or nonexistence of the father and child relationship between that person and a child * * * [and] the person against whom the action is brought does not admit the existence or nonexistence of the father and child relationship, the court, * * * upon the motion of any party to the action, shall order genetic tests to be taken in accordance with section 3111.09 of the Revised Code." (Emphasis added.)

■ When a divorce action is pending between the putative parents of a child, the court considering that action has original jurisdiction to determine whether the parent-child relationship exists between a party and the child. R.C. 3111.06(A). However, a divorce action is not subject to the genetic testing mandates of R.C. 3111.08 until the jurisdiction of the court to determine paternity is invoked by pleadings which put the existence or nonexistence of the father-child relationship in issue.

■ Doug alleged in his complaint that Alexis was born issue of the marriage, and Karen admitted the truth of that averment in her answer. While the parties' agreement on the issue of paternity did not require the court to find that Doug was Alexis' father, the pleadings did not put her parentage into issue. Doug's motion to determine Alexis' paternity raised an issue outside the scope of the pleadings. Absent an amendment of the complaint allowed pursuant to Civ.R. 15, the court was not required to consider Doug's motion. To hold otherwise would permit Doug to amend his complaint after trial has commenced without first obtaining leave of court to do so. Accordingly, the court did not err in failing to order genetic testing before entering its decree.

Thus, Doug's second assignment of error is overruled.

## SUMMARIZED THIRD ASSIGNMENT OF ERROR

"The trial court erred by failing to notify plaintiff/appellant that the June 11, 1993 hearing was the final hearing on the property and custody issues."

In this assignment of error, Doug asserts that the notice he received regarding the June 11, 1993 hearing did not specify that it was to be the final hearing on the property and custody issues. Doug contends that he was told that these issues would be "addressed later in a final 'Divorce Trial'" and that notice that the June 11 hearing was the final hearing was sent after June 11.

The transcript of the hearing reveals that Doug and Karen testified regarding the property and custody issues. Furthermore, Doug, who was represented by counsel at the hearing, submitted Dr. Moon's testimony, which was relevant to the custody and visitation issues. Any notice sent to Doug after June 11 regarding the purpose of that hearing is not contained in the record.

■ Doug makes no argument as to what he would have done differently if he had received the notice to which he now claims he was entitled. The property and custody issues appear to have been fully heard. Therefore, Doug has failed to demonstrate that he was prejudiced by any alleged failure to fully notify him of the purpose of the hearing, and we need not consider the propriety of the notice.

Accordingly, Doug's third assignment of error is overruled.

## SUMMARIZED FOURTH ASSIGNMENT OF ERROR

"The trial court erred in ordering child and spousal support to be paid monthly and in ordering child and spousal support to be paid directly from the Air Force."

Doug argues that the trial court's decree violates federal law by requiring Doug's child and spousal support obligations to be paid on a monthly basis when his VSI is paid in an annual lump sum. Additionally, Doug alleges that the court erred by requiring that the obligations be paid directly from the Air Force because the Defense Finance and Accounting Service ("DFAS") is responsible for issuing Doug's VSI payment.

As to Doug's argument that the court erred by ordering that the support obligations be paid monthly, we disagree.

■ The divorce decree stated the "rate" of child support and spousal support in terms of a monthly amount. The court's use of this method to determine the amount to be paid did not determine when the payments were required. The decree specifically stated that these amounts were to be paid directly to the Greene County Child Support Enforcement Agency and to Karen, respectively, out of Doug's VSI payments, which the court recognized as annual payments. Federal law prohibits state courts from altering the normal pay and disburse-

ment cycles of federal entities when those entities are subject to court orders to garnish wages for the payment of child and spousal support. Section 659(e), Title 42, U.S.Code. We construe the divorce decree to be consistent with this federal law. Accordingly, the court determined the appropriate amount of support per month and required that an amount sufficient to pay Doug's obligation for the year be deducted from his VSI payment.

The divorce decree states that Doug's support obligations are to be paid "out of the VSI directly from the United States Air Force." Doug correctly points out that he receives his VSI payment from the DFAS, not the Air Force. The court's error in naming the entity responsible for the VSI payment appears to be harmless. The trial court has properly sent a withholding order to the DFAS to compel it to withhold Doug's child support obligation and make appropriate payments to the Greene County Bureau of Support. Thus, despite the trial court's improper designation, the orders are being properly enforced.

For the foregoing reasons, Doug's fourth assignment of error is overruled.

## SUMMARIZED FIFTH ASSIGNMENT OF ERROR

"The trial court erred by setting the amounts of child and spousal support unreasonably high and denying the plaintiff/appellant a reasonable subsistence."

In this assignment of error, Doug claims that his support obligations consume so much of his income that he is denied a reasonable subsistence. In support of this argument, Doug relies upon R.C. 3113.215(B)(2)(a), which provides in part as follows:

"The court or agency shall review the obligor's gross income and living expenses to determine the maximum amount of child support that it reasonably can order without denying the obligor the means for self-support at a minimum subsistence level."

Doug's reliance on this section is misplaced. R.C. 3113.215(B)(2)(a) provides the framework for determining child support when the combined gross income of the parents is less than $6,600 annually. The child support schedule does not establish a presumed support obligation when the income of the parents falls below $6,600. This statute does not apply to this case because Doug's VSI income alone is about $17,400 annually.

When the combined gross income of the parents is between $6,600 and $150,000, the trial court is required to calculate the amount of child support in accordance with the child support schedule set forth in R.C. 3113.215(D). R.C. 3113.215(B)(1). The amount calculated through the schedule is presumed to be the correct amount. Based upon the testimony regarding Doug's and Karen's

incomes, the amount of child support ordered was in accordance with the child support schedule. R.C. 3113.215(B)(3) lists factors which the trial court may consider to justify a deviation from the scheduled amount of support. From our review of the record and these factors, we conclude that the trial court did not abuse its discretion in determining that the scheduled amount was just and appropriate.[1]

Although the argument is not clearly stated, Doug appears to further argue that the trial court abused its discretion by ordering him to pay rehabilitative spousal support to Karen for two years. Doug argues that Karen has been able to obtain employment as a legal assistant or paralegal in the past and that she has her own income to use towards her paralegal degree.

The trial court has discretion to award spousal support to help the spouse obtain education to qualify her for appropriate employment. Despite Karen's present ability to obtain employment, Doug has failed to demonstrate that the trial court's decision to award spousal support for educational purposes was arbitrary or unreasonable. Accordingly, the trial court did not abuse its discretion.

Thus, Doug's fifth assignment of error is overruled.

## SUMMARIZED SIXTH ASSIGNMENT OF ERROR

"The trial court erred in dividing the proceeds from the sale of the marital house."

In his final assignment of error, Doug asserts that the trial court erred according to Civ.R. 60(A) by making a clerical mistake in determining the amount of equity from the sale of the marital home. At no time did Doug make a Civ.R. 60(A) motion requesting that the trial court correct this alleged clerical error. He does not point to any evidence in the record to demonstrate this alleged error. Accordingly, Doug has failed to demonstrate any error in the division of the equity from the sale of the marital home.

Doug's sixth assignment of error is overruled. We will now consider Karen's cross-assignments of error.

---

1. On page 19 of his brief, Doug quotes from "Section 3113.215(B)(4)(c)" and "Section 3113.215B(4)(F)." R.C. 3113.215(B)(4) is not divided into subsections, and we are unable to locate the source of his quotations. Doug asserts that these sections required the court to deduct the amount he must pay for health insurance for Alexis from his income when determining the amount of his support obligation. This assertion is without merit. The court may consider these payments when determining the amount of the support obligation; however, the trial court did not abuse its discretion when it failed to reduce Doug's support obligation.

### FIRST CROSS–ASSIGNMENT OF ERROR

"The trial court abused its discretion in finding that plaintiff/appellant's Voluntary Separation Incentive (VSI) was income and not marital property."

In her first assignment of error, Karen asserts that Doug's VSI payments constitute marital property to be equitably divided between the parties. The trial court determined that VSI payments constitute income.

Karen asserts that the amount of the VSI payments is computed in a manner similar to that used to compute retirement benefits, and, therefore, VSI payments should be treated as payment for prior service. The formula for computing the amount of VSI payments is as follows:

"The annual payment of the incentive shall equal 2.5 percent of the monthly basic pay the member receives on the date appointed, enlisted, or transferred to the reserve component, multiplied by twelve and multiplied again by the member's years of service. The annual payment will be made for a period equal to the number of years that is equal to twice the number of years of service of the member." Section 1175(e)(1), Title 10, U.S.Code.

Doug served in the United States Air Force for sixteen years. He was married to Karen for nine of those years. By voluntarily separating from active duty after sixteen years, Doug was precluded from receiving retirement benefits which would have vested if he had served for twenty years. No payments were made by the parties to finance the VSI payments. Karen claims that nine-sixteenths of Doug's VSI payments constitute marital property and that she is entitled to one-half of that amount.

In *Holcomb v. Holcomb* (1989), 44 Ohio St.3d 128, 541 N.E.2d 597, the Ohio Supreme Court explained why vested pension plans accumulated during the marriage constitute marital property:

"In *Kaechele* [*v. Kaechele* (1988), 35 Ohio St.3d 93, 518 N.E.2d 1197], * * * we indicated that the right to receive a fixed bonus guaranteed over a certain future period is more like an asset than income, in view of the fact that it is payment for past services. Similarly, a monthly pension benefit is payment for past services, and if the services were rendered during coverture, it constitutes a marital asset. The rationale is that pension payments are deferred compensation earned during working years. Therefore, if the employee was married while working, logically, the right to the deferred compensation belongs to the marital estate." (Emphasis added, citations omitted.) *Holcomb, supra,* at 132, 541 N.E.2d at 600.

The characterization of VSI payments has not yet been considered in Ohio and has rarely been considered throughout the country. In order for Karen's analogy between retirement benefits and VSI payments to have merit, VSI payments

must be considered deferred compensation earned during the marriage. Therefore, our analysis will focus on the nature of VSI payments.

The legislative history of the Act creating the VSI program "reveals that Congress enacted the legislation 'because of [its] concern over the effect of strength reductions * * * on [service members] and their families.'" Polchek, Recent Property Settlement Issues for Legal Assistance Attorneys (Dec. 1992), Army Lawyer 4, 10, quoting H.R.Rep. No. 311, 102d Cong., 1st Sess. 556 (1991), reprinted in 1991 U.S.Code Cong. & Adm.News 1042, 1112. Congress also noted that the program "would give a 'fair choice to personnel who would otherwise have no option but to face selection for involuntary separation, and to risk being separated at a point not of their own choosing.'" Army Lawyer at 11.

Given the Congressional intent behind the VSI program, VSI payments are more closely analogous to severance benefits than retirement benefits. See Polchek, *supra*, at 10–11. Like severance payments, VSI benefits attempt to compensate a separated service member for future lost wages. See *In re DeShurley* (1989), 207 Cal.App.3d 992, 255 Cal.Rptr. 150 (discussing treatment of severance pay as separate property); *In re Kuzmiak* (1986), 176 Cal.App.3d 1152, 222 Cal.Rptr. 644 (discussing treatment of involuntary separation pay as separate property). The mere fact that the amount of the payments is determined according to the number of years of service does not necessarily render these payments compensation for past services. Rather, severance pay is frequently calculated according to the number of years of employment. Although severance pay received during the marriage is marital property to the same extent that wages paid during the marriage are marital property, severance payments intended to compensate for wages lost after the divorce cannot be characterized as marital property. See *Miller v. Miller* (Jan. 16, 1987), Lucas App. No. L–86–011, unreported, 1987 WL 5493. Accordingly, the trial court did not abuse its discretion when it determined that Doug's VSI payments were his separate income and not marital property.[2]

Although Ohio courts have not previously addressed the characterization of VSI benefits, courts in Arizona and Florida have considered this issue. *In re Crawford* (App.1994), 180 Ariz. 324, 884 P.2d 210; *Abernethy v. Fishkin* (Fla.App. 1994), 638 So.2d 160. *Crawford* and *Abernethy* each found that voluntary separation benefits could be divided as marital property, but those cases are distinguishable from the present case. In each of those cases, the divorce was

---

2. We note that our determination that VSI benefits received after the marriage are the separate property of the separated service member is not inconsistent with the Supreme Court's opinion in *McCarty v. McCarty* (1981), 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589. Accordingly, we need not decide whether the court's holding in McCarty prevents the states from dividing VSI benefits as marital property.

finalized before the husband decided to voluntarily separate from active duty, and the decrees awarded the wife a percentage of the husband's military retirement benefits upon his retirement. The husbands in both cases chose to separate before they had served twenty years and thereby sacrificed their right to receive any military retirement benefits. This action by Abernethy violated his specific duty "not to pursue any course of action that would defeat the wife's right to receive a portion of the husband's full net disposable retired or retainer pay." When Crawford chose to separate, he was only nine months away from being entitled to receive his retirement benefits.

Ohio case law raises a question whether a court may grant a spouse an interest in a future, unvested retirement plan. *King v. King* (1992), 78 Ohio App.3d 599, 606–607, 605 N.E.2d 970, 974–975 (abuse of discretion to award percentage of military pension benefits which would not vest for nine years). Cf. *Lemon v. Lemon* (1988), 42 Ohio App.3d 142, 144–145, 537 N.E.2d 246, 248–250 (present value of unvested pension constitutes marital property). Where the spouse is not deprived of property which has already been awarded pursuant to the decree, the equities are much less compelling to find that the separation incentive constitutes marital property. If the *Crawford* or *Abernethy* court had not found the incentive payments to be marital property, the husband would have been permitted to unilaterally decrease his obligation and the amount his former spouse would have received. Accordingly, those courts were compelled to analogize separation payments to retirement benefits to prevent manifest injustice. The *Crawford* court designated that as the most important reason for its holding. In *Abernethy*, the court recognized that commentators had the view that VSI did not constitute retirement pay, but the court chose to rely on *Crawford*, which was factually and procedurally similar.

In the present case, the equities do not compel a similar result. Doug's uncontradicted testimony revealed that he was given an ultimatum from his superior to either accept the VSI and voluntarily separate or face immediate involuntary separation. Doug was given this ultimatum, made his decision, and began receiving VSI payments before the trial court made a determination and division of marital property. If he would have decided not to voluntarily separate, Doug may have been involuntarily separated. Upon involuntary separation, the maximum benefit paid is a single $30,000 lump-sum payment. Section 1174, Title 10, U.S.Code. By choosing to accept the VSI payments, therefore, Doug insured a higher, more consistent income from which the court was able to award child and spousal support. Doug's choice to voluntarily separate did not divest Karen of any expectation interest previously awarded to her. In the absence of the factual and procedural circumstances of *Crawford* and *Abernethy*, an analogy between VSI and severance pay is more appropriate.

Accordingly, Karen's first cross-assignment of error is overruled.

## SECOND CROSS–ASSIGNMENT OF ERROR

"The trial court abused its discretion in failing to account for the appellant's substantial dissipation of marital assets during the pendency of this action and crediting appellee/cross-appellant for her interest in this amount."

Karen argues that Doug dissipated marital assets by spending $21,000 on attorney fees during the pendency of the divorce proceedings. Karen contends that the trial court erred in failing to compensate her for Doug's financial misconduct according to R.C. 3105.171(E)(3).

The transcript of the June 11, 1993 hearing includes lengthy testimony by Doug regarding his expenditure of the funds available to him from the date of filing through the end of 1992. Doug admitted spending $21,000 for attorney fees for representation both on this matter and on several criminal charges. Of the $41,000 Doug had at his disposal between the date of filing of the divorce and the end of 1992, $9,100 was the proceeds of a marital account and his last pay check before he and Karen separated. The remainder of the funds was Doug's post-separation wages and VSI payments. According to testimony elicited by Karen's attorney, Doug spent approximately $10,400 on marital expenses during the relevant time. Karen testified that she and Doug paid their attorney fees with money that they had on hand. There is no evidence of Karen's income during the relevant time period or of how much she spent on marital expenses during that period.

As part of its decree, the trial court ordered Doug to pay the arrearages he owed for child support pursuant to the temporary order. The trial court did not account for the income of either of the parties during the pendency of the divorce and apparently determined the division of property as of the date of the filing of the divorce complaint. Accordingly, the court considered the wages of the parties during the pendency of the divorce to be their separate property. Doug was entitled to use his separate property to pay for his attorneys. The trial court did not abuse its discretion in failing to compensate Karen for any alleged dissipation of marital assets.

Thus, Karen's second assignment of error is overruled.

## THIRD CROSS–ASSIGNMENT OF ERROR

"The trial court erred in failing to make a specific finding that the three thousand ($3,000.00) of appellee/cross-appellant's [sic] property in the form of an IRA account was a non-marital asset of appellee/cross-appellant [sic]."

In this assignment of error, Karen argues that the trial court committed reversible error by failing to specifically designate in the decree whether the

$3,000 account she held at Merrill Lynch was considered a separate or marital asset.

■ Construing the trial court's decision on divorce and final judgment and decree of divorce together, it appears that the court found the Merrill-Lynch account to be marital property. In the decision the court specifically listed that account as one of the assets given to Karen in the court's division of the marital assets. In the decree, prepared by Doug's attorney, the court stated that "[t]he parties also agree that each shall retain their own respective financial accounts." Karen's attorney signed the decree. Accordingly, the trial court did designate the property as marital property, although it did not do so in a clear manner, and it awarded the account to Karen. Furthermore, Karen waived any right to have this issue determined more definitively by agreeing to a disposition of the parties' financial accounts.

The third cross-assignment of error is overruled.

## FOURTH CROSS–ASSIGNMENT OF ERROR

"The trial court erred in failing to account for the marital debts in the amount of five hundred dollars."

In her final assignment of error, Karen contends that the trial court erred by failing to account for $500 in marital debt in the divorce decree. She points to Doug's testimony that a $350 bill for repair to the water heater remained unpaid and her testimony that a $150 water bill remained unpaid. Both of these debts were incurred after the divorce was filed.

Karen now argues that these debts are marital debts. However, in her post-trial brief, submitted to the court in lieu of oral closing arguments, Karen included a section titled "marital debts," which stated in pertinent part as follows: "There appear to be no outstanding marital debts and as a consequence each party would be responsible for his or her own respective individual assets." Doug's post-trial brief also did not make reference to any marital debts. There-fore, it was reasonable for the trial court to conclude, as it stated in the decree, that "[t]he parties have agreed that there are no outstanding marital debts."

■ The trial court did not abuse its discretion in finding that there were no marital debts. Accordingly, the fourth cross-assignment of error is overruled.

The judgment of the trial court will be affirmed.

*Judgment affirmed.*

GRADY, P.J., and BROGAN, J., concur.