DUNHAM, Appellee and Cross–Appellant,

v.

DUNHAM, Appellant and Cross–Appellee.

[Cite as *Dunham v. Dunham,* 171 Ohio App.3d 147, 2007-Ohio-1167.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 05AP–584 and 05AP–951.

Decided March 15, 2007.

148

150

Crabbe, Brown & James, L.L.P., Amanda C. Baker, and Richard D. Wetzel, for appellee and cross-appellant.

Andrea R. Yagoda, for appellant and cross-appellee.

PETREE, Judge.

{¶ 1} Defendant, Frank L. Dunham ("appellant") appeals, and plaintiff, Jo Ann D. Dunham ("appellee"), cross-appeals from a judgment entry and decree of divorce filed by the Franklin County Court of Common Pleas, Division of Domestic Relations, on March 2, 2005.

{¶ 2} The parties were married on May 14, 1982. At the time of the marriage, appellee had a seven-year-old child, Matthew. Two daughters were born as issue of the marriage. At the time of the final hearing, both daughters were attending college or university. On June 1, 2002, appellee filed for divorce from appellant in the Franklin County Court of Common Pleas, Division of Domestic Relations.

{¶ 3} The magistrate entered temporary orders, including spousal support to appellee in the amount of $5,750 per month. Prior to trial, there were partial distributions of marital funds to pay for attorney fees, tuition for the girls, and real estate and income taxes by agreed judgment entry.

{¶ 4} At the time of the hearing, appellant was 63 years old, and appellee was 56. Appellant had begun his employment as an accountant with Coopers &

Lybrand in June 1962. Prior to the marriage, he had attained partnership in the firm. In 1998, Coopers & Lybrand merged with Price Waterhouse to form PricewaterhouseCoopers ("PWC"). In June 2000, when appellant reached the mandatory retirement age of 60, he retired from PWC. Appellant continued doing consulting work for a short time after his retirement, but due to a restrictive clause in his partnership agreement, further opportunities for employment in his field were difficult to come by.

{¶ 5} Appellee had been employed by Cincinnati Bell at the time of the marriage. Because of difficulties with a pregnancy, appellee and appellant had agreed that appellee should not return to work. Appellee became a homemaker, raised the children, became active in community and volunteer efforts, and, along with appellant, entertained clients. In 1998, appellee's son was killed by a drunk driver. At the suggestion of a grief counselor, appellee went to work at a store earning $10 per hour. Appellee stated that due to the stress of the pending divorce, she was making many mistakes, so she eventually quit to avoid being fired. Her employment in that job lasted approximately two years.

{¶ 6} During their marriage, the parties enjoyed a lifestyle that included multiple country club memberships, private schools and universities for their children, sizeable contributions to Notre Dame and Holy Cross College, golf trips, travel and fine dining, and owning and raising thoroughbred racehorses.

{¶ 7} At the time of the hearing, the parties had stipulated to much of their separate property. The trial court approved the parties' stipulations. The parties could not agree with respect to four assets that appellant claimed as separate property.

{¶ 8} First, there was the parties' residence on Tremont Road. Appellant claimed $178,000 in separate property in a home appraised at $1,100,000. According to appellant, this sum represented an initial down payment of $50,000 that appellant had received from the sale of his premarital house, along with passive appreciation. Appellant invested the $50,000 in the parties' first marital home, and at trial, appellant sought to trace the funds through the sale and purchase of different marital residences between 1983 and 2004. Appellant also claimed $34,286 in separate property for remodeling the kitchen with money he inherited from his mother.

{¶ 9} Second, there was $45,096 in a Fifth Third Bank account with a stipulated balance of $242,341 that appellant claimed was a settlement payment made to him as compensation in a wrongful death action for the loss of his stepson, Matthew.

{¶ 10} Third, there was $48,000 representing the alleged value of two securities in a Merrill Lynch account containing a stipulated balance of $634,916. Appellant

asserted that he could trace ownership of the securities that he owned prior to the marriage.

{¶ 11} Fourth, there was the premarital portion of appellant's retirement plan from PWC consisting of benefits earned prior to the marriage.

{¶ 12} Other contested issues included the appropriate way to value their Social Security benefits, the division of some liabilities, the amount of spousal support ordered, the award of attorney fees, and income tax considerations.

{¶ 13} The matter was tried over several days between March and May 2004. At the conclusion of the testimony, the trial court requested that the parties submit proposed findings of fact and conclusions of law. By one judgment entry and decree of divorce, the trial court entered judgment on March 2, 2005.

{¶ 14} For reasons that have no bearing on the issues on appeal, i.e., motion for new trial, motion to vacate, affidavit of disqualification, etc., the appeal was delayed for a period of time. Appellant timely filed his notice of appeal, and appellee timely filed a notice of cross-appeal. The cases were consolidated by this court for purposes of briefing and oral argument.

{¶ 15} Appellant raises five assignments of error, as follows:

ASSIGNMENT OF ERROR NO. 1

The trial court acted contrary to law in requiring appellant to trace his separate property by utilization of a clear and convincing standard of proof rather than a preponderance of the evidence standard.

ASSIGNMENT OF ERROR NO. 2

The trial court abused its discretion and acted contrary to law in its property division.

ASSIGNMENT OF ERROR NO. 3

The award of spousal support was an abuse of discretion and against the weight of the evidence.

ASSIGNMENT OF ERROR NO. 4

The trial court abused its discretion in awarding $30,000.00 in attorney fees to appellee.

ASSIGNMENT OF ERROR NO. 5

The trial court abused its discretion by failing to properly address taxation issues.

{¶ 16} Appellee raises three cross-assignments of error, as follows:

ASSIGNMENT OF ERROR 1

The trial court erred in the determination and valuation of defendant-appellant's separate property interest in the RBAP [Retirement Benefit Accumulation Plan] retirement plan.

ASSIGNMENT OF ERROR 2

The trial court erred in the amount of spousal support awarded to plaintiff-appellee in that the award is against the manifest weight of the evidence as its findings on monthly expenses of plaintiff-appellee are not supported by the record, that defendant-appellant maintains the marital standard of living and plaintiff-appellee cannot. The award is inequitable and is an abuse of discretion.

ASSIGNMENT OF ERROR 3

The trial court erred in the award of attorney fees as it did not take into consideration the substantial fees incurred after March 23, 2004, defendant-appellant's conduct, the disparity in both the assets awarded, disposable after tax incomes, temporary orders and that defendant-appellant will be able to maintain his prior lifestyle and plaintiff-appellee cannot.

## Standard of Proof

{¶ 17} In his first assignment of error, appellant contends that the trial court used the incorrect standard of proof with respect to his separate property claims. The trial court utilized the "clear and convincing" standard of proof instead of the "preponderance of the evidence" standard that both parties now realize is the appropriate standard. However, a review of the record reveals that, at trial, counsel for appellant advised the trial court on two separate occasions that the correct burden of proof for the tracing of separate property was "clear and convincing."

{¶ 18} First, in response to testimony regarding the disposition of appellee's premarital home, trial counsel for appellant stated: "And, Your Honor, just for the record, it's my understanding that if she's going to use that to trace separate property, the appropriate way is clear and convincing." Second, in response to an objection to the basis for an expert opinion, counsel for appellant stated: "Under *Muir*, Your Honor, the statute says that one must trace the property by clear and convincing evidence. We've done the tracing. It's the only evidence in here."

{¶ 19} Trial counsel for appellee also advised the trial court that the appropriate burden of proof on appellant's separate property claims was "clear and convincing." Counsel used this standard in her proposed findings of facts and conclusions of law. The trial court then used this standard in its decree.

{¶ 20} As the parties now acknowledge, the party seeking to have property declared separate has the burden of proof by a preponderance of the evidence. *Osting v. Osting,* Allen App. No. 1–03–88, 2004-Ohio-4159, 2004 WL 1770292; *Kerchenfaut v. Kerchenfaut* (Sept. 5, 2001), Allen App. No. 1–01–14, 2001 WL 1023105; *Peck v. Peck* (1994), 96 Ohio App.3d 731, 734, 645 N.E.2d 1300; *Duffey v. Duffey* (Feb. 26, 2002), Franklin App. No. 01AP–709, 2002 WL 264595; *Vujovic v. Vujovic,* Medina App. No. 04CA0083–M, 2005-Ohio-3942, 2005 WL 1819527. The trial court's determination of whether property is marital or separate property will not be overturned unless it is against the manifest weight of the evidence. *An v. Manson,* Franklin App. No. 06AP–90, 2006-Ohio-6733, 2006 WL 3718436.

{¶ 21} However, under the invited-error doctrine, a party may not take advantage of an error that he himself invited or induced the trial court to make. In *Ctr. Ridge Ganley, Inc. v. Stinn* (1987), 31 Ohio St.3d 310, 31 OBR 587, 511 N.E.2d 106, the Supreme Court of Ohio was faced with a case in which the complaining party invited the error by eliciting parol evidence as to the intent of the parties when they entered into a contract. The court indicated that the appellants could not then complain when the opposing party entered similar but contradictory evidence of intent. The court stated that more than a mere waiver of evidence was at issue in the case and that " '[a] party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make.' " Id. at 313, 31 OBR 587, 511 N.E.2d 106, quoting *Lester v. Leuck* (1943), 142 Ohio St. 91, 26 O.O. 280, 50 N.E.2d 145, paragraph one of the syllabus.

{¶ 22} In *State v. Carswell,* Summit App. No. 23119, 2006-Ohio-5210, 2006 WL 2821384, at ¶ 20–21, the appellant asserted error because the trial court erroneously used the "manifest injustice" standard in ruling on a motion to vacate a guilty plea before sentencing. The Ninth District Court of Appeals found that the appellant had himself used that standard in asserting that the trial court should vacate his plea. The court of appeals held that because appellant had first suggested this incorrect burden of proof, he could not successfully complain about the error on appeal.

{¶ 23} Here, as in *Carswell,* appellant first suggested this incorrect burden of proof during the trial. Subsequently, both parties used the erroneous burden of proof in connection with appellant's separate property claims. Under the invited-error doctrine, we decline to allow appellant to take advantage of his own error and have another chance to present his case.

{¶ 24} Appellant's first assignment of error is overruled.

## Real Property and Inheritance

{¶ 25} In appellant's second assignment of error and appellee's first cross-assignment of error, the parties assert that the trial court abused its discretion in its property division.

{¶ 26} As discussed above, the party seeking to have a particular asset classified as separate property has the burden of proof to trace the asset to his or her separate property. The factual findings of the trial court are reviewed under a manifest-weight standard. *An,* 2006-Ohio-6733, 2006 WL 3718436.

{¶ 27} Therefore, our task is not to reweigh the evidence but to determine whether there was competent, credible evidence to support the trial court's findings. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 8 O.O.3d 261, 376 N.E.2d 578; *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273.

{¶ 28} At trial, appellant claimed a separate property interest of $178,000 in the marital residence. He claimed that $34,286 was from an inheritance from his mother that was used for a portion of the kitchen remodeling. The remaining $143,714 included an initial down payment of $50,000 on the parties' first marital home and passive appreciation that accrued through the purchase and sale of the marital residences in Indiana, Michigan, and Ohio. Appellant, a certified public accountant, testified in detail how he traced these amounts, adjusting the separate property percentage of the equity in each sale and purchase based on the gain in the sale of the homes. Appellant's accounting of the funds ran to many pages in tiny handwriting that is nearly illegible. Appellant did not include appreciation on mortgage reduction, which was paid fully with marital funds. There were also some funds from the sale of the home in Grosse Pointe, Michigan, that appellant deposited into his Merrill Lynch account.

{¶ 29} The trial court found appellant's testimony and method of tracing and calculating appreciation less credible or reliable than that of appellee's expert, who testified that appellant's final figures were based on assumptions that were not supported by the evidence. In addition, the expert noted that if the property truly were traceable, there would be no need for appellant to make those assumptions. Appellee's expert agreed that the initial $50,000 of separate property was reinvested in each successive home. However, as to the passive appreciation, he testified that the funds were too commingled to accept appellant's conclusions. The trial court agreed with appellee's expert and credited appellant with $50,000 in separate property on the marital residence with an appraised value of $1,100,000.

{¶ 30} With respect to the kitchen-remodeling funds, appellant deposited the funds from his inheritance in several accounts and transferred varying

amounts over several years. The balance in some of these accounts fell below the initial deposit from the inheritance, yet appellant still attempted to trace these funds through the different accounts. Appellee's expert testified that these funds were hopelessly commingled with marital funds, and the trial court accepted this as fact.

{¶ 31} After reviewing the voluminous record in this trial, we conclude that the trial court was not obliged to accept appellant's attempt to trace the property, and there was competent, credible evidence to support the trial court's findings with respect to the marital residence and also the inheritance. The trial court's findings were not against the manifest weight of the evidence.

### Wrongful–Death Insurance Proceeds

{¶ 32} Appellant claimed $45,096 of a Fifth Third Bank account was separate property that he received as settlement proceeds from the wrongful death of his stepson, Matthew. In 1998, Matthew was killed by an uninsured drunk driver in the state of Michigan. Matthew was appellee's biological son and was seven years old when the parties married.

{¶ 33} Plaintiff's Exhibits 16, 17, and 18 indicate that appellee and Matthew's sisters were the only beneficiaries of wrongful-death proceeds arising out of the settlement, and that appellant signed the settlement agreement in his capacity as executor. Appellant did not sign the release of claims; only appellee, as the natural mother, and Matthew's sisters executed the document. Plaintiff's Exhibit 18, an invoice from a law firm in Cincinnati, shows that, listed under "Settlement Proceeds," appellee received $200,000 in the form of an annuity and each of Matthew's sisters received $100,000. Listed under "Disbursements," out of the $166,250 in cash proceeds from the settlement, appellant received $45,096.26 and Matthew's biological father received $10,000, and the law firm received $110,662.44 in fees and $491.30 in expenses.

{¶ 34} Both parties testified that the $10,000 payment to Matthew's biological father was a voluntary payment, as the biological father was not a beneficiary to the claim. Counsel in the wrongful-death claim advised against payment to the biological father because he could not demonstrate significant involvement in the child's life. Appellant was the person who decided to make that payment, despite legal advice to the contrary. Appellant, as stepfather, had no statutory right under Michigan law to be entitled to proceeds from a wrongful-death lawsuit. Mich. Comp. Laws Service 600.2922. Therefore, if the payment to the biological father was not payment to a beneficiary, the trial court could logically conclude that the payment to appellant was also not payment to a beneficiary.

{¶ 35} Appellant introduced Defendant's Exhibit EE 8(A), an entry of the Michigan Probate Court adopting the settlement agreement. Appellant is listed

as the personal representative on that document and also as the recipient of $45,096.26 in cash. Appellant contends that the probate court document is proof he was a beneficiary because his payment and the biological father's payment are listed as cash. Appellant contends that the document shows that the payment was not for fees because only the attorney fees were listed as fees. The trial court disagreed noting that under Michigan law, appellant was not qualified to be a beneficiary in the wrongful-death action because he had never legally adopted Matthew.

{¶ 36} Defendant's Exhibit EE 8(A) contains a handwritten notation that the cash proceeds were actually disbursed to *appellee* to make payment to appellant, payment to the biological father, and payment to the law firm in the same amounts as set out on the invoice. Appellee asserted that the payment to appellant was reimbursement for expenses appellant incurred as the personal representative and executor, including a very expensive and elaborate funeral. Appellee testified that she just signed the checks that appellant put in front of her, but she had no real comprehension of where the money was going.

{¶ 37} Clearly there was sufficient evidence before the trial court for it to find that the $45,096 paid to appellant was not settlement proceeds from the wrongful-death action but rather a payment out of appellee's cash portion of the settlement for expenses appellant incurred in his capacity as executor and personal representative. From appellant's testimony, it is logical to infer that the $10,000 payment to the biological father was in the nature of a gift and that the attorney fees were those required to protect appellee's interests in the wrongful death of her son. The trial court was not required to accept appellant's testimony that his payment was settlement proceeds from the wrongful-death action. Therefore, we find that the trial court did not err in finding that this sum was not separate property.

### The Merrill Lynch Account

{¶ 38} Appellant also contends that $48,000 of the stipulated balance of $634,916 in the Merrill Lynch account was his separate property traceable to two securities he held at the time of his marriage. The stocks were held in some form from 1982 until 1996, when he started actively trading those stocks. Over the course of the marriage, appellant made many withdrawals for gifts and made marital deposits into the account. Appellant based his separate-property claim on a detailed record of gains and losses on the purchase, dividends, and sale of the two stocks. Appellant introduced 19 pages of his own tiny handwritten calculations, approximately 80 pages of backup documentation, and a three-inch binder containing statements from this account from 1996 through 2003.

{¶ 39} Appellee's expert testified that the funds were hopelessly commingled and no longer identifiable or traceable. Appellee's expert also found mathematical errors in some of appellant's accounting. Appellee's expert did not review the three-inch binder.

{¶ 40} Appellant argues the trial court should not have relied upon appellee's expert's testimony because the expert admitted that he had not reviewed the underlying documents contained in Plaintiff's Exhibit 14. Appellant also argues that the trial court relied on the expert testimony and appellee's proposed findings of fact, rather than conducting its own review of Plaintiff's Exhibit 14.

{¶ 41} This court has reviewed the transcript, exhibits, and the parties' proposed findings of fact and conclusions of law. In this case, there is such an abundance of documentation, accounting, and calculations, much of it in miniscule, nearly illegible handwriting, that it would be a Herculean task for the trial court to review or retrace the steps appellant took to detail the activity in this account. Consequently, it was not an abuse of discretion for the trial court to rely on expert testimony as a guide to the understanding and interpretation of the documentary evidence.

{¶ 42} Even if the trial court did not review Plaintiff's Exhibit 14 (and there is absolutely no evidence that the trial court did not), it is clear that from the sheer volume of the activity in the account, the mathematical errors that appellant admitted to on his own exhibits, and certain assumptions appellant made with regard to allocation of funds in this account to marital and premarital property, it was not against the manifest weight of the evidence for the trial court to find that the funds were commingled and untraceable.

### Retirement Benefit Accumulation Plan

{¶ 43} Appellee's first cross-assignment of error concerns the separate-property interest in appellant's retirement plan. Appellee argues that the trial court erred in using a simple coverture fraction to ascertain the percentage of the plan that was separate property. The trial court took the established value of the plan, $1,097,283, and used a time-only coverture formula of 20 years' unmarried employment divided by 38 years' total employment for a separate property percentage of 52.63 percent and a marital percentage of 47.37 percent. Appellee argues there was no competent evidence to support the use of that formula.

{¶ 44} Instead, appellee claims that her expert's coverture formula gave proper weight to the premarital and marital earnings because appellant received significantly higher earnings in his later (marital) years of employment compared to his premarital earnings. Appellee's expert used a career-indexed earnings formula to establish the percentage of the plan that was separate property. Appellee asserts that the coverture formula the trial court should have used takes

premarital earnings divided by total career earnings to determine the separate property percentage of 25.94 percent and marital property percentage of 74.06 percent.

{¶ 45} The trial court found that appellant's retirement from PWC comprised several elements. The only retirement asset that was alleged to have a separate property component was the Retirement Benefit Accumulation Plan ("RBAP"). The RBAP contained a cash benefit portion of the plan of $66,957 which was entirely marital. The remaining portion of the RBAP comprised both marital and separate property and totaled $1,030,326.

{¶ 46} The trial court found that on June 18, 1962, appellant commenced his employment with Lybrand, Ross Brothers & Montgomery as a salaried employee in the audit division. In 1973, the company became Coopers & Lybrand. Also in 1973, appellant became a partner. At that time, appellant's compensation significantly increased because he was now entitled to receive a portion of the profits of the firm.

{¶ 47} The trial court further found that the first 11 years of an employee's career are the most pressure packed and critical, as they are crucial to being made a partner. Those years form the foundation for later successes and share of the profits. On the day before the parties' marriage, appellant had been awarded 435 shares in the partnership, nearly half of the eventual 900 shares he held at retirement.

{¶ 48} The trial court then reviewed and summarized the testimony of appellant and the experts. The trial court found appellee's expert's conclusions to be primarily based on his review of an old Coopers & Lybrand Partners and Principals Agreement, dated October 1, 1982, which was not in effect at the time of appellant's retirement.

{¶ 49} The 1982 partnership agreement contained a clause stating that the retiree would receive, in monthly payments, an annual benefit equal to 1.25 percent of each year's adjusted compensation. That clause was missing from the 1998 partnership exhibit. However, appellee's expert testified that appellant's RBAP compensation was consistent through the entire time it was Coopers & Lybrand. 1998 was the year Coopers & Lybrand merged with Price Waterhouse and became PWC. Appellant retired in 2000.

{¶ 50} After finding that appellee's expert opinion was based on an agreement that was no longer in effect, the trial court turned to the simple coverture formula proposed by appellant's expert to determine appellant's separate property interest in the RBAP. Appellant's expert had testified that the marital coverture formula suggested by appellant was an appropriate method to allocate

separate property based on the absence of documentation from the firm as to how appellant's retirement benefits were calculated.

{¶ 51} The trial court was faced with competing theories from the experts. It is for the finder of fact to decide the weight to be given the evidence. Here, the trial court concluded that it could not rely on appellant's proposed formula for determining separate property. It used the time-based coverture formula referred to in *Hoyt v. Hoyt* (1990), 53 Ohio St.3d 177, 559 N.E.2d 1292. In *Hoyt*, the Supreme Court of Ohio stated:

> In determining the proportionality of the pension or retirement benefits, the non-employed spouse, in most instances, is only entitled to share in the actual marital asset. The value of this asset would be determined by computing the ratio of the number of years of employment of the employed spouse during the marriage to the total years of his or her employment.

Id. at 182, 559 N.E.2d 1292.

{¶ 52} In this case, the retirement plan was complex, and it was not at all clear from the testimony exactly how appellant's benefits were calculated. Appellee further argues that the trial court should have required the parties to submit additional information about the RBAP, subpoenaing documents from PWC if necessary. The trial court had before it testimony that appellant's early years at the firm were crucial, and expert testimony that a time-based coverture was one method by which to determine the separate-property component. When the trial court determined that appellee's expert's testimony was not reliable, it still had substantive, credible evidence remaining from which it could make its findings.

{¶ 53} Appellee's first cross-assignment of error is not well taken.

### Social Security Benefits

{¶ 54} Appellant asserts that the trial court abused its discretion in the way it valued the parties' Social Security benefits and the way it offset marital assets to account for the discrepancy in the parties' Social Security benefits.

{¶ 55} The trial court followed the precedent set forth by the Supreme Court of Ohio when it considered Social Security benefits in making its property division. In *Neville v. Neville*, 99 Ohio St.3d 275, 2003-Ohio-3624, 791 N.E.2d 434, the Supreme Court of Ohio held: "In making an equitable distribution of marital property in a divorce proceeding, a trial court may consider the parties' future Social Security benefits in relation to all marital assets." Id. at syllabus.

{¶ 56} Appellee presented the only expert testimonial evidence on the present value of the Social Security benefits. The trial court relied on that testimony and the exhibits prepared by the witness and found that the present value of the marital portion of appellant's Social Security benefits was $184,264. Appellant

does not disagree as to this amount except as to tax considerations, which shall be addressed later. The trial court found the present value of appellee's marital portion of her Social Security benefits to be $13,583.

{¶ 57} Appellant contends that the trial court erred by accepting appellee's expert's analysis of appellee's benefits by using coverture to calculate present value, and by not including the spousal benefit with a present value of $5,231 and the widow's benefit of $87,347. Appellant objected to the expert testimony on the grounds that counsel for appellee had not laid a sufficient foundation for the trial court to accept certain assumptions the expert used in his analysis.

{¶ 58} The trial court overruled the objection and accepted the expert's data and methodology using figures based on immediate retirement for appellant (who was already retired from PWC and age 63), and a projected retirement at age 62 for appellee, the earliest time that she would be eligible to begin receiving benefits. Consistent with its other findings, the trial court did not project that either party would return to work. The trial court addressed, but rejected as too speculative, the assumption that appellee would never remarry, and thus be entitled to the spousal benefit. The trial court also rejected the assumption that appellee would receive the widow benefit, for that assumption requires the assumption that appellant predecease appellee, as well as the assumption that appellant will never remarry.

{¶ 59} We note that if the trial court is going to apply *Neville* and consider future Social Security benefits, the trial court must accept certain actuarial assumptions such as the use of mortality tables and projected interest rates. Taking these factors into account, the expert presented alternate figures based on whether the assumption was made that appellee would receive the spousal benefit or the widow benefit. Appellant presented no evidence on the issue. In rejecting additional assumptions about remarriage and widowhood, the trial court took a conservative approach and decided that making those assumptions was too speculative. These were matters within the purview of the trial court as the court considered and weighed all the evidence, including the parties' demeanor, health, age, and ability to find gainful employment. The trial court's findings were based on the expert testimony and, therefore, were not against the manifest weight of the evidence.

{¶ 60} Appellant also argues that the trial court erred by using pretax values instead of after-tax values with respect to Social Security benefits. There was no evidence presented to the trial court on this issue, and appellant himself used pretax figures on the balance sheet he prepared.

### Debt In Excess of $10,000

{¶ 61} Appellant listed accounts payable in the amount of $10,114 as of December 31, 2003. The trial court excluded this debt from the distribution of assets and liabilities. The trial court's basis for the exclusion was twofold. First, the trial court indicated that appellant's testimony with regard to these debts was not specific, and second, the parties had stipulated to pay all monthly obligations in full. Appellant argues that there was no such stipulation, that appellant did offer specific testimony as to the debt claimed, and that appellee was residing in the marital home while receiving temporary spousal support but did not contribute financially to the upkeep of the house during that time.

{¶ 62} We have been unable to find such a stipulation in the record. However, the trial court did incorporate the temporary orders into the decree. Those orders required both parties to be responsible for their own credit card charges and cell phone charges. Appellant testified that the sum of $10,114 represented "the bills paid in the month of January or—the amounts owed at December 31, 2003, that would be paid subsequent to 12–31–2003. That would include such items as water, Columbia Gas bill, American Electric Power, credit cards, that included a variety of things, the whole host of the items such as that."

{¶ 63} The trial court's decision to exclude that particular debt is supported by the evidence because appellant was unable to specify how much of the debt included credit card charges for which he was responsible. The trial court addressed the equities of appellee's continuing to live in the marital home in the context of the use of marital funds to pay real estate taxes. Appellant's argument is not well taken.

### Tax Liability Fourth Quarter 2003

{¶ 64} PWC's fiscal year ran from October 1 through September 30. As a result, appellant received income from PWC in October, November, and December of 2003 that was reported to the Internal Revenue Service as income in 2004. As a result, the income taxes were payable as part of the 2004 tax liability. The trial court ordered the parties to file a joint return for the year 2003 and for the parties to file separately in 2004.

{¶ 65} Appellant contends that the trial court erred in requiring appellant to pay this marital tax liability that had accrued prior to the judicial termination of the marriage on March 3, 2004. Appellee counters that argument by asserting that the trial court does not abuse its discretion by allocating debts between the parties on a nonequal basis as long as the allocation is equitable.

{¶ 66} We agree with appellee. In *Maloney v. Maloney*, 160 Ohio App.3d 209, 222, 826 N.E.2d 864, ¶ 48, the Second District Court of Appeals held

that joint debts are not property or interests in property that the trial court must equally divide between the parties. The trial court may allocate debt on an unequal basis and order one or the other of the parties to pay some or all of the joint debt out of his or her share of marital or separate property. But so long as the allocation is equal, there is no abuse of discretion.

{¶ 67} Here, the allocation of the marital assets and liabilities is equal.

## Capital Loss Carryover

{¶ 68} The parties stipulated to the amount of $50,793 as the capital loss carryover for 2003. The trial court adopted appellant's proposed findings on this item, and after using the current capital gains rate, found that the capital loss carryover had a marital value of $7,169. Appellee attributed a higher figure for this asset, but the trial court used appellant's finding nearly verbatim. On appeal, appellant argues for the first time that the trial court should have discounted this asset to a present value and not treated this as cash to appellant because he can take only $3,000 as a tax loss in each subsequent year.

{¶ 69} It is well established that arguments not raised in the trial court, and raised for the first time on appeal, need not be considered. *Curtis v. Ohio Adult Parole Auth.*, Franklin App. No. 04AP–1214, 2006-Ohio-15, 2006 WL 23248, citing *State ex rel. Phillips v. Capots* (Sept. 22, 1994), Franklin App. No. 94APE04–499, 1994 WL 521137; *Miller v. Wikel Mfg. Co.* (1989), 46 Ohio St.3d 76, 78, 545 N.E.2d 76.

{¶ 70} Accordingly, appellant's second assignment of error and appellee's first cross-assignment of error are overruled.

## Spousal Support

{¶ 71} In appellant's third assignment of error and appellee's second cross-assignment of error, the parties dispute the amount of spousal support awarded to appellee. In simplest terms, appellant claims the award is too high, and appellee claims the award is too low.

{¶ 72} In awarding appellee indefinite spousal support in the amount of $7,250 per month, the trial court considered all of the factors listed in R.C. 3105.18(C)(1). That statute provides that the trial court shall consider the following factors in fashioning such an award:

(C)(1) In determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support, which is payable either in gross or in installments, the court shall consider all of the following factors:

(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

(b) The relative earning abilities of the parties;

(c) The ages and the physical, mental, and emotional conditions of the parties;

(d) The retirement benefits of the parties;

(e) The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

(2) In determining whether spousal support is reasonable and in determining the amount and terms of payment of spousal support, each party shall be considered to have contributed equally to the production of marital income.

{¶ 73} Here, in addition to making findings concerning each of the factors, the trial court noted that it paid particular attention to the duration of the marriage, the income-producing capacity of appellee, appellant's having retired, appellee's age and inability to accumulate additional retirement assets, and the standard of living established by the parties during the marriage.

{¶ 74} The essence of appellee's claim that the award of spousal support is inadequate is that appellee will not be able to maintain the "lavish upper class lifestyle" the couple enjoyed while married, but that appellant will. Appellee contends that it was error for the trial court to permit appellant to maintain his lifestyle in the marital residence while appellee will be forced by her reduced

economic circumstances to acquire less expensive housing and a lower standard of living than she enjoyed during the marriage.

{¶ 75} Appellate review of an award of spousal support is whether the trial court abused its discretion. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140.

{¶ 76} Obviously, neither party will enjoy exactly the same standard of living now that there are two households to maintain. Neither party is guaranteed the same standard of living enjoyed during the marriage. *Kaechele v. Kaechele* (1988), 35 Ohio St.3d 93, 518 N.E.2d 1197. The fact that appellant retained the marital home was assented to by appellee. Nor did appellee move from the marital home or contribute to the expenses of the home during the pendency of the action when she was receiving temporary support. Appellee was given the opportunity but was unable to testify with specificity as to her projected expenses postdivorce. This inability tied the trial court's hands to some extent. Consideration of living expenses is not one of the enumerated factors in R.C. 3105.18(C), but may be considered at the trial court's discretion. *Derrit v. Derrit,* 163 Ohio App.3d 52, 2005-Ohio-4777, 836 N.E.2d 39.

{¶ 77} Here, the trial court accepted the parties' assumption that appellee would purchase a home in the $400,000 range. This was not an unreasonable leap of logic given the fact that appellee testified that she desired a smaller home in the $400,000 to $500,000 range that would be easier to maintain. Therefore, the trial court's decision to deduct $400,000 from appellee's liquid assets available for investment was not an abuse of discretion. This assumption acted to appellee's advantage in terms of calculating appellee's income. When we review the entire matter as a whole, it is clear that the award of spousal support is part and parcel of the trial court's overall plan to fashion equitable (not necessarily monetarily equal) relief. Furthermore, it is clear from a review of the record that the trial court specifically considered the parties' lifestyle in determining the spousal support award. Where susceptible to multiple interpretations of the equitability and adequacy of the award, we generally will construe the evidence consistently with the judgment. See *Karches v. Cincinnati* (1988), 38 Ohio St.3d 12, 19, 526 N.E.2d 1350. The spousal support statute does not require that the court apply an equal standard of living to both parties, only that it consider all the factors and fashion an award that is appropriate and reasonable. *Goldbach v. Goldbach* (Dec. 29, 1993), Lorain App. No. 92CA005510, 1993 WL 548758. Appellee's argument that the award of spousal support was inadequate is not well taken.

{¶ 78} Much of the same analysis applies to appellant's argument that the award of spousal support was excessive. Appellant first objects to the wording of

the spousal support award, asserting that the language is similar to that in *Kunkle v. Kunkle* (1990), 51 Ohio St.3d 64, 554 N.E.2d 83, and appears to limit the jurisdiction of the trial court to modify the award, in that the support was of indefinite duration and that spousal support could be terminated only upon death or remarriage.

{¶ 79} In its decree, the trial court awarded spousal support of indefinite duration and went on to state: "Spousal support shall terminate upon the first of either party's death, Plaintiff's remarriage or her cohabitation with an unrelated male. The court shall retain jurisdiction to modify this spousal support award."

{¶ 80} We have reviewed the language used in *Kunkle* and find that in that case, the order was internally inconsistent and contained additional language that appeared to limit the court's power of modification. Id. at 72, 554 N.E.2d 83. No such language exists in the present order. We find no merit to appellant's claim that the trial court has restricted its ability to modify the award.

{¶ 81} Appellant next argues that the trial court erred in calculating appellant's income by including a stipulated $1,574.65 per month from the "Special Capital Account" a/k/a Pension Surplus. This payment was scheduled to terminate July 13, 2005, and appellant claims it was an abuse of discretion for the trial court to include it in the total. It is true that the decree was not journalized until March 2005, close to the time the payments were scheduled to terminate. But the trial in this matter concluded in March 2004, and the parties submitted proposed findings of fact and conclusions of law in July 2004. At the time the decree was issued, appellant was still receiving the payment. This was not an abuse of discretion. Furthermore, the wording of the stipulation invited the trial court to use the payment as income. The parties stipulated as follows: "The parties stipulate that this is income for purposes of spousal support." Following that statement was a list of monthly payments and a total figure that included the Pension Surplus. In a small parenthetical, it was noted that the monthly payment was due to terminate on July 13, 2005. If appellant did not want the payout included in stipulated income for purposes of spousal support, he should not have stipulated it as income for purposes of spousal support. Regardless, the trial court retains jurisdiction to modify the award, and this problem is more appropriately addressed in a motion to modify.

{¶ 82} Appellant next argues that the trial court abused its discretion by including appellee's $10,000 per month annuity from the wrongful death of her son as taxable income. For the edification of the court, appellant calculated the difference between treating the income as nontaxable versus taxable in the share of cash each party would have each month. According to appellant's figures, appellant's after-tax cash was not altered, and it served to increase appellee's

percentage of after-tax cash from 41 percent to 42 percent. In the overall fashioning of the decree, this error is harmless, and taken as a whole, the trial court's award was not an abuse of discretion.

{¶ 83} Appellant next argues that the trial court erred in deducting $400,000 from appellee's income derived from assets to allow her to purchase a home. This argument was discussed earlier in connection with appellee's argument. The trial court did not abuse its discretion in this regard.

{¶ 84} Appellant argues that the trial court failed to take into account that many of the marital assets were valued on an after-tax basis. A review of the record shows that the trial court did this with respect to both appellee and appellant. In making his calculations, appellant added $20,000 of imputed income to appellee and included the $400,000 housing allowance as an investment asset. Neither the trial court nor appellant treated appellant's equity in his home in such a manner. As discussed previously, the trial court gave its reasons for assuming a $400,000 housing allowance and specifically found that it would not impute income to appellee. The trial court did not abuse its discretion in this regard.

{¶ 85} Appellant's third assignment of error and appellee's second cross-assignment of error are overruled.

### Attorney Fees

{¶ 86} In appellant's fourth assignment of error and appellee's third cross-assignment of error, both parties take issue with the trial court's award of attorney fees. Appellant argues it was an abuse of discretion to award the sum of $30,000 to appellee for attorney fees. Appellee argues the award was inadequate, and the trial court should have awarded her the sum of $100,000.

{¶ 87} Before addressing the merits of the parties' arguments, we must first determine which statute to apply.

{¶ 88} At the time the trial court made its award, R.C. 3105.18(H) was the controlling statute on the subject of attorney fees. That version of the statute stated:

> In divorce or legal separation proceedings, the court may award reasonable attorney's fees to either party at any stage of the proceedings, including, but not limited to, any appeal, any proceeding arising from a motion to modify a prior order or decree, and any proceeding to enforce a prior order or decree, if it determines that the other party has the ability to pay the attorney's fees that the court awards. When the court determines whether to award reasonable attorney's fees to any party pursuant to this division, it shall determine whether either party will be prevented from fully litigating that party's rights

and adequately protecting that party's interests if it does not award reasonable attorney's fees.

148 Ohio Laws, Parts IV and V, 9782, 9911.

{¶ 89} After the decree was issued, but while the motion for a new trial was pending, the General Assembly repealed subsection (H) of R.C. 3105.18 and enacted R.C. 3105.73, effective April 27, 2005. That statute provides:

(A) In an action for divorce, dissolution, legal separation, or annulment of marriage or an appeal of that action, a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.

{¶ 90} Thus, the new statute sets out a different standard for courts to apply when deciding whether an award of fees is warranted. Under the old statute, the court could award reasonable fees to any party at any stage of the proceedings if it determined the other party had the ability to pay. Under the new statute, the court must determine whether the award is equitable, and in doing so may award all or part of reasonable fees and litigation expenses to either party. Under the old statute, the court was to determine whether either party would be prevented from fully litigating that party's rights and adequately protecting that party's interests if it did not award reasonable attorney fees. Under the new statute, in determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.

{¶ 91} The question then becomes whether R.C. 3105.73 constitutes a retroactive law in violation of Section 28, Article II of the Ohio Constitution. The Supreme Court of Ohio has laid out a procedure a court should follow to determine when a law is unconstitutionally retroactive. *State v. Cook* (1998), 83 Ohio St.3d 404, 410, 700 N.E.2d 570, citing *Van Fossen v. Babcock & Wilcox Co.* (1988), 36 Ohio St.3d 100, 522 N.E.2d 489, paragraph one of the syllabus.

{¶ 92} First, the court must determine whether the General Assembly expressly intended the statute to apply retroactively. If so, the court next considers whether the statute is substantive, rendering it unconstitutionally retroactive, as opposed to merely remedial. *Bielat v. Bielat* (2000), 87 Ohio St.3d 350, 353, 721 N.E.2d 28.

{¶ 93} The uncodified law with regard to this statute indicates that the legislature intended the new statute to apply retroactively. Under the uncodified law, the section is to apply to any action for divorce, if any of the following apply:

"The action or proceeding is brought, or a notice of appeal in the action or proceeding is filed, prior to the effective date of this act, and the action or proceeding is pending in a trial or appellate court on the effective date of this act."

{¶ 94} Thus, we conclude that the General Assembly expressly intended for this provision to apply to the Dunhams' divorce.

{¶ 95} Next we address the question of whether the statute is substantive or merely remedial. Appellant argues that the old statute should apply, citing *Forbis v. Forbis,* Wood App. No. WD–04–056 and WD–04–063, 2005-Ohio-5881, 2005 WL 2931851, at ¶ 82, in which the Sixth District Court of Appeals held that "a literal reading of the statute would require us to retroactively apply a completely different substantive standard to the trial court's decision in this case. Since that retroactive application would affect substantive rights and, thus, would be unconstitutional, we decline to apply the new standard to the trial court's decision to award attorney fees." Id.

{¶ 96} Appellee directs us to *Fisher v. Fisher,* Henry App. No. 7–05–03, 2005-Ohio-5615, 2005 WL 2709526, and *Packard v. Mayer–Packard,* Cuyahoga App. No. 85189, 2005-Ohio-4392, 2005 WL 2039183, in which the Third District Court of Appeals and the Eighth District Court of Appeals respectively applied the new statute retroactively without discussion of the constitutional issue.

{¶ 97} We respectfully disagree with the Sixth District Court of Appeals. In *Patrick v. Ressler,* Franklin App. No. 04AP–149, 2005-Ohio-4971, 2005 WL 2303687, at ¶ 43–51, this court had the opportunity to address an attorney-fees provision for a contract of indebtedness where the contract was entered into before the statute was enacted. This court held that under Ohio law, "attorney fees are in the nature of costs, and statutes relating to costs are remedial." *State ex rel. Beacon Journal Publishing Co. v. Ohio Dept. of Health* (1990), 51 Ohio St.3d 1, 3, 553 N.E.2d 1345 (holding that statute authorizing attorney fees to litigants successfully suing to obtain public information did not violate constitutional provision against retroactive legislation). See, also, *Flory v. Cripps* (1937), 132 Ohio St. 487, 493, 8 O.O. 484, 9 N.E.2d 500 (amended statute allowing for payment of reasonable attorney fees in connection with sale of realty, subsequent to execution of mortgage, did not result in impairment of contract; "[t]his is a remedial provision and the statute in force at the time of the rendition of the judgment is controlling").

{¶ 98} Here, the new attorney-fee provision not only allows for attorney fees, but also litigation expenses. We believe the analysis in *Patrick* is correct, and the legislation is remedial. This matter was pending on the effective date of the statute. Accordingly, we hold that the attorney-fee provision in R.C. 3105.73 applies to this case.

{¶ 99} Therefore, through no fault of the trial court, we must vacate the attorney-fee award and remand the matter for a determination of fees pursuant to the new statute.

{¶ 100} Appellant's fourth assignment of error and appellee's third cross-assignment of error are sustained to the extent that the trial court is directed to reexamine the attorney-fees issue under the new standard. The portion of the parties' argument that the trial court abused its discretion in its award of fees is overruled as moot.

## Additional Taxation Issues

{¶ 101} In his fifth assignment of error, appellant asserts that the trial court erred by ordering the parties to file a joint return in 2003, by not including an order that appellee be responsible for taxes on her income generated in 2004 on assets to which she was awarded, by not considering the tax ramifications in 2005 resulting from the liquidation of the Merrill Lynch account, by awarding appellee both exemptions for the daughters, and by failing to include an order that the parties share equally in any tax liabilities due.

{¶ 102} The trial court ordered the parties to file a joint tax return for 2003 and that each party be responsible for one-half of the liability. The trial court found that filing a joint return, as opposed to married filing separately, would result in a net tax savings of $3,000 to $5,000.

{¶ 103} Appellant claims that the evidence showed that filing a joint return would result in increased liability for him because he would lose the deduction for the temporary spousal support he paid. Appellant also contends that the trial court's order failed to account for the interest and penalties which might accrue, although he points to no evidence in the record on this point. Appellant claims the order to file jointly amounts to a retroactive modification of the temporary orders.

{¶ 104} We disagree. The trial court had evidence before it from which it could find that filing a joint return in 2003 would result in a net tax liability savings of $3,000 to $5,000. In addition, appellant testified that "on net it would be less filing jointly than separately." Finally, the trial court agreed to a withdrawal of marital assets to be paid toward a marital liability. The trial court had all this evidence before it, found the taxes were a joint marital liability, and ordered each to pay one-half. This is neither an abuse of discretion nor against the manifest weight of the evidence.

{¶ 105} Appellant disagrees with the trial court's decision that each party file separately in 2004, asserting that the order unfairly requires him to pay taxes

for interest and dividend income on the Merrill Lynch account, which was an asset awarded to appellee.

{¶ 106} In reality, the trial court found that the 2004 income tax liability was a separate liability for each of the parties. The trial court was not in a position at the conclusion of the trial to know whether the Merrill Lynch account would result in additional tax liability or a loss carryover. Thus, it was equitable for the trial court to order each party separately liable.

{¶ 107} Appellant argues the trial court erred in overruling his motion to vacate the decree in order to allow the trial court to consider tax ramifications resulting from the liquidation of the Merrill Lynch account. The Merrill Lynch account was awarded to appellee. Appellant claimed that without authorization from appellant, Merrill Lynch liquidated the account.

{¶ 108} The trial court determined that this was a claim arising from the unauthorized sale of securities and required the joinder of additional parties, as well as the fact that another forum besides the domestic relations court would be more appropriate to address that issue. The trial court noted that since the Merrill Lynch account was in appellant's name, appellant was the person who possessed standing to pursue any action against Merrill Lynch.

{¶ 109} We agree. Newly discovered evidence refers to evidence in existence at the time of trial of which the aggrieved party is excusably ignorant. Appellant did not allege operative facts to support his Civ.R. 60(B)(2) and (5) motion.

{¶ 110} Appellant asserts that the trial court erred in awarding both exemptions for the daughters to appellee in 2004 and thereafter if appropriate. Appellant raises the issue of his filing as head of household to lower his tax liability.

{¶ 111} The trial court found that appellant could not benefit from the exemptions, and his own testimony supports that finding. Appellant testified that because of the level of his income, he could not benefit from these exemptions. We can find no evidence in the record that the head-of-household issue was presented to the trial court. It is not clear whether appellee will be entitled to take those deductions, but in light of appellant's testimony that they were of no benefit to him, the trial court's order was not an abuse of discretion or against the manifest weight of the evidence.

{¶ 112} The trial court ordered both parties to share equally any refunds generated from prior joint tax returns, but it did not make an order regarding liability resulting from those returns. Joint tax liability is created by the signing and filing of a joint tax return. Although the trial court has jurisdiction to allocate possible tax liability, it was within the discretion of the trial court to leave

that determination to the taxing authorities. During the marriage, appellant had sole control over the finances of the couple. If any liabilities are found to exist, appellee may have the option to avail herself of the Innocent Spouse Rule. See 2 Sowald & Morgenstern, Domestic Relations Law (2002) 381, Section 28.23.

{¶ 113} Appellant's fifth assignment of error is not well taken and is overruled.

{¶ 114} Based on the foregoing, we overrule appellant's first assignment of error, overrule appellant's second assignment of error and appellee's first cross-assignment of error, overrule appellant's third assignment of error and appellee's second cross-assignment of error, and sustain appellant's fourth assignment of error and appellee's third cross-assignment of error to the extent that the trial court is directed to reexamine the attorney-fees issue under the provisions of the new statute. The portion of the parties' argument that the trial court abused its discretion in its award of fees is overruled as moot. Finally, we overrule appellant's fifth assignment of error. Therefore, the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, is affirmed in part and reversed in part, and this cause is remanded to that court for further proceedings in accordance with law and consistent with this opinion.

Judgment affirmed in part
and reversed in part,
and cause remanded.

SADLER, P.J., and FRENCH, J., concur.