[Cite as *Dach v. Homewood*, 2015-Ohio-4191.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Kristin Dach et al., | : | |
| Plaintiffs-Appellees, | : | |
| v. | : | No. 14AP-502 |
| | | (C.P.C. No. 10DR-2706 ) |
| David A. Homewood, | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant, | : | |
| Kristin Dach, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 14AP-503 |
| v. | : | (C.P.C. No. 10DR-2706) |
| David A. Homewood et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on October 8, 2015

*Farlow and Associates, LLC, Beverly J. Farlow* and *Robert C. Petty*, for appellant Kristin Dach.

*Grossman Law Offices, Andrew S. Grossman* and *Jodi R. Smilack*, for appellee David A. Homewood.

APPEALS from the Franklin County Court of Common Pleas, Division of Domestic Relations

T. BRYANT, J.

{¶1} Plaintiff-appellant, Kristin Dach ("Dach"), and defendant-appellant, David A. Homewood ("Homewood"), both appeal a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, that granted the parties a divorce and divided their property. For the following reasons, we affirm the judgment of the trial court.

## A. BACKGROUND

{¶2}    Dach filed a complaint for divorce from Homewood on June 21, 2010.  The parties were married on June 1, 2004 and have one child together.  After a lengthy trial, the trial court issued a judgment entry-decree of divorce on September 28, 2012, including a division of assets and resolution of parenting issues.  Both parties filed notices of appeal and the appeals were consolidated in this court.  However, because the divorce decree did not divide all of the parties' assets, we dismissed the appeals for lack of a final appealable order.  *Dach v. Homewood*, 10th Dist. No. 12AP-920, 2013-Ohio-4340.

{¶3}    On remand, the trial court filed an addendum to the judgment entry that resolved the division of assets which had been outstanding.  The trial court noted that the final property division had not been previously concluded because the parties both filed notices of appeal which deprived the trial court of jurisdiction before they filed their required memoranda.[1]   Both parties filed second notices of appeal, which were again consolidated in this court.

## B. ASSIGNMENTS OF ERROR

{¶4}    Dach raises the following eight assignments of error for our review:

[I.] THE TRIAL COURT ERRED AS A MATTER OF LAW IN RULING THAT THE OHIO CONSTITUTION AND R.C. 3105.12(B)(1) PRECLUDE THE COURT FROM ADOPTING A DE FACTO DATE OF COMMENCEMENT OF THE PARTIES' MARRIAGE PURSUANT TO R.C. 3105.171.

[II.] THE TRIAL COURT ERRED BY FAILING TO DIVIDE THE MARITAL ESTATE EQUITABLY.

[III.] THE TRIAL COURT ERRED AS A MATTER OF LAW IN FAILING TO INCLUDE HUSBAND'S ACTUAL INCOME FOR PURPOSES OF CALCULATING SUPPORT.

[IV.] THE COURT ERRED IN FINDING THAT [HOMEWOOD] HAD A SEPARATE PROPERTY INTEREST IN THE JOINT UBS ACCOUNTS.

[V.] THE COURT ABUSED ITS DISCRETION IN FINDING THAT 2CHECKOUT.COM HAD A VALUE OF $12,000,000 IN 2004.

---

[1] We note that the trial court heard many days of testimony and issued three lengthy and detailed decisions in this case.

[VI.] THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO AWARD ATTORNEY'S FEES TO PLAINTIFF.

[VII.] THE COURT ERRED WHEN IT IMPUTED INCOME TO PLANTIFF.

[VIII.] THE COURT ERRED IN FINDING THAT THE VALUE OF THE HOUSEHOLD GOODS AND FURNISHINGS WAS $59,002.

{¶5}    Homewood raises the following six assignments of error for our review:

[I.] The trial court erroneously found that Alan "agree[d] that marital monies were used to reduce the principal balance" on the mortgage loans of four rental properties.

[II.] The trial court *sua sponte* created a procedurally improper process under which Alan was required to submit "proposed accountings" under penalty of forfeiting his marital interest in the four rental properties.

[III.] The trial court applied a coverture fraction to the erroneously-determined marital component of the value of each of the four rental properties.

[IV.] The trial court declared all the income and appreciation in value of the UBS account to be marital, even though some of that income and appreciation by statute must be Alan's separate property.

[V.] The award of spousal support is excessive, unreasonable and inappropriate.

[VI.] *(a Conditional Assignment of Error)*.  If this Court sustains Kristin's third assignment of error, then the Court must reverse the trial court's determination of Kristin's income for purposes of child support and spousal support and order the trial court to determine Kristin's income on the same, "all sources of income" basis as it determines Alan's income.

## C. DACH'S APPEAL

### 1. Dach's First Assignment of Error

{¶6}    By Dach's first assignment of error, she contends the trial court erred as a matter of law in finding that the Ohio Constitution and R.C. 3105.12(B)(1) preclude the trial court from adopting a de facto date of commencement of the parties' marriage

pursuant to R.C. 3105.171. In the trial court, Dach had filed a motion to establish a de facto date of commencement of the marriage for purposes of valuation of assets. The trial court held a hearing and issued a decision denying the motion, finding that the Ohio Constitution and statutes prevented the court from doing so because the court would be recognizing a legal status for the unmarried parties that approximates the effect of marriage.

{¶7} The parties were married on June 1, 2004, however, Dach argued that she moved to Ohio from Pennsylvania with her son in April 2001 and the parties lived as a family continuously until 2010. The parties' daughter was born on February 26, 2002. Homewood's business that he founded before meeting Dach, 2Checkout.com,[2] increased in value over the time of the marriage into a company with a $15,000,000 value in 2010. Dach requested that the court set a de facto commencement date of the marriage in order to capture the increase in value of the company that occurred before the marriage ceremony so it could be included as a marital asset.

{¶8} R.C. 3105.171(A)(2) provides that a trial court may select a de facto date of marriage in order to equitably divide assets, as follows:

> (2) "During the marriage" means whichever of the following is applicable:
>
> (a) Except as provided in division (A)(2)(b) of this section, the period of time from the date of the marriage through the date of the final hearing in an action for divorce or in an action for legal separation;
>
> (b) If the court determines that the use of either or both of the dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property. If the court selects dates that it considers equitable in determining marital property, "during the marriage" means the period of time between those dates selected and specified by the court.

{¶9} On appeal, Dach argues that the trial court erred in finding that the Ohio Constitution and the Revised Code prohibit establishing a de facto commencement date of the marriage. Homewood argues that this assignment of error is moot because the trial

---

[2] 2Checkout.com is a global payments solutions provider servicing online retailers. The company is an S-Corporation and Homewood is the sole shareholder. Homewood started the business before the parties started dating.

court expressed an alternative basis for its decision, finding that there is nothing inequitable in giving effect to the parties' actual marriage date and Dach is not challenging that basis. Dach responds by arguing that the assignment of error is not moot because she did challenge the commencement of the marriage as the ceremonial date in her second assignment of error, where she argues that the trial court erred in failing to divide the marital estate equitably, and that the trial court did not make a finding that there is nothing inequitable in giving effect to the parties' actual marriage date. We agree that the trial court expressed an alternative basis for its decision. We also agree that in the context of her second assignment of error, Dach challenged the trial court's finding regarding the marriage commencement date. Accordingly, we will address whether the trial court's use of the parties' ceremonial marriage date as the date the marriage commenced was an abuse of discretion.

{¶10} The trial judge recognized that invocation of R.C. 3105.171 depends on a trial court's finding of potential inequity in division of marital property resulting from failure to include in the estate to be divided assets acquired or created by the parties before or after the presumed beginning or ending dates of the actual marriage status, as R.C. 3105.171(A)(2)(b) provides: "If the court determines that the use of either or both dates specified in division (A)(2)(a) of this section would be inequitable, the court may select dates that it considers equitable in determining marital property." Considering the evidence before it upon the motion for finding a retroactive de facto date of marriage, the trial court found no inequity in use of the presumed beginning or ending dates.

{¶11} A trial court's decision to select beginning or ending dates other than the ceremonial wedding date is a question of fact and will not be overruled on appeal absent an abuse of discretion. *Drummer v. Drummer*, 3d Dist. No. 12-11-10, 2012-Ohio-3064, ¶ 50, citing *Renz v. Renz*, 12th Dist. No. CA2010-05-034, 2011-Ohio-1634, ¶ 7. In order to find that the trial court abused its discretion, we must find more than an error of law or judgment. An abuse of discretion implies that the court's attitude is unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Most instances of an abuse of discretion involve decisions that are unreasonable as opposed to arbitrary and capricious. *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.,* 50 Ohio St.3d 157 (1990). A decision that is unreasonable is one that has no sound reasoning process to support it. When applying the abuse of discretion

standard of review, an appellate court may not substitute its judgment for that of the trial court.  *Blakemore* at 219.  When an appellate court considers a trial court's interpretation and application of a statute, the de novo standard of review applies.  *Giusti v. Akron Gen. Med. Ctr.,* 178 Ohio App.3d 53, 2008-Ohio-4333, ¶ 12 (9th Dist.)  Given the facts of this case, we find the trial court did not abuse its discretion in using the ceremonial date as the commencement date of the marriage.

{¶12}  A statutory presumption exists that the duration of a marriage begins on the date of the ceremonial marriage through the date of the final divorce hearing.  R.C. 3105.171(A)(2)(a).  Upon a finding of inequity, the trial court may select dates that it considers equitable in determining marital property.  R.C. 3105.171(A)(2)(b).

{¶13}  Dach urges us to follow *Bryan v. Bryan*, 8th Dist. No. 97817, 2012-Ohio-3691.  In *Bryan*, the parties became engaged and began living together in 1988, but were not married until 1994.  Both parties worked and they used the wife's income for living expenses and saved much of the husband's income for a down payment on the marital home.  The trial court determined that it was inequitable to fail to consider the wife's contribution for six years which allowed the parties to save a down payment.  The trial court set the de facto marriage commencement date as the date when the parties became engaged and moved in together.  The appellate court found that the trial court did not abuse its discretion.

{¶14}  In *Drummer*, the court found that the trial court acted within its discretion in declining to set a de facto marriage date.  There the parties began living together in 1988, were married in 1994, and had one child approximately four years later.  In the husband's 2010 action for divorce, the wife argued that the equitable commencement of the marriage for purposes of property division, was 1988 since the parties lived together continuously from 1988 until 2010.   On appeal, the wife urged the court to follow *Bradley v. Bradley*, 8th Dist. No. 78400 (July 5, 2001), a case in which the parties started a relationship in 1979, their son was born in 1980, and the wife remained a stay-at-home mother, and was financially dependent on the husband.  In *Drummer*, the parties had one child approximately four years after they were married, the wife was employed, and not financially dependent on her husband.  On appeal, the appellate court distinguished the cases and observed that while the record could persuade a court that the commencement date of the marriage for purposes of property division was prior to the ceremonial date,

since the trial court had not been convinced that the ceremonial date was inequitable, the appellate court would not substitute its judgment for the trial court.

{¶15} Similarly, in *Sweet v. Sweet*, 11th Dist. No. 2007-A-0003, 2009-Ohio-1924, the court found that the trial court did not abuse its discretion by maintaining the marriage ceremony date as the date of the commencement of the marriage. The parties were married in 1993 and filed a complaint for divorce in 2003. The wife asserted that the trial court erred in finding that the marital residence was separate property. The residence was built by the husband prior to the marriage, but the value of the residence increased during the course of the marriage and the appreciation in value of the residence was divided as marital property. The wife maintained that she had an equitable interest in the property because she assisted in the construction of the house. The appellate court found that the trial court had not erred, even though the wife had contributed time and labor, she had not created a substantial interest in his separate property. They had not lived together prior to the marriage and their finances were not mingled.

{¶16} Finally, in another recent case, *Sherman v. Sherman*, 1st Dist. No. C-120691, 2013-Ohio-3501, the trial court used the ceremonial date as the commencement date. The parties married in 2004, however, their romantic relationship began many years prior to 2004. The wife maintained that the parties were engaged to be married twice before, once in 1982 and again in 1988. However, the parties did not communicate for 16 years. Then they rekindled their romance and married shortly thereafter. The wife argued that the trial court should have given consideration to the long history of the parties. The appellate court found that the trial court had not abused its discretion in not selecting a de facto commencement date because the parties had little or no contact for 16 years and were not holding themselves out as husband and wife before the ceremony.

{¶17} Here, the parties lived together for several years. Dach testified that the parties did not commingle their money. Neither party was totally dependent on the other financially because they both had incomes. There is no question that Homewood started the company before the parties were engaged and he remained the sole shareholder and owner. Dach contributed time and labor in the company for which she was paid a salary, and as an employee among others, she contributed to its growth in value but she had not created a substantial interest in Homewood's separate property. The appropriate appreciation was divided as a marital asset. R.C. 3105.171(A)(2)(b) provides that only if

the court determines that the ceremonial date would be inequitable then the court may use a date it finds equitable in determining marital property. Here, although the trial court did not make a specific finding that the ceremonial date was equitable, it did not need to do so because it did not determine that the ceremonial date was inequitable. Given the statutory presumption that the commencement date of the marriage is the ceremonial date and because the evidence in the record reasonably may be taken to support the trial court's decision, we do not find that the trial court abused its discretion in utilizing the ceremonial marriage date as the date that the marriage commenced. Because we affirm the trial court's decision to deny Dach's request for a de facto commencement date of marriage on the basis that there was no abuse of discretion in determining it was not inequitable to use said date, we need not consider the trial court's reliance on the Ohio Constitution to address this issue. Accordingly, Dach's first assignment of error is overruled.

### 2. Dach's Second Assignment of Error

{¶18} By her second assignment of error, Dach contends that the trial court erred by failing to divide the marital estate equitably. Dach contends that the trial court equally divided the marital estate instead of equitably dividing the marital estate and failed to consider the factors set forth in R.C. 3105.171(F). Dach's entire argument focuses on the equal division of 2Checkout.com, the business, of which Homewood is the sole shareholder.

{¶19} A domestic court has broad discretion to make divisions of property. *Middendorf v. Middendorf*, 82 Ohio St.3d 397, 401 (1988), citing *Berish v. Berish,* 69 Ohio St.2d 318 (1982). The characterization of property as marital or separate property is a factual issue. *Taub v. Taub*, 10th Dist. No. 08AP-750, 2009-Ohio-2762, ¶ 15. An appellate court is not to reweigh the evidence, but to determine whether the record contains competent, credible evidence to support the trial court's findings. *Dunham v. Dunham*, 171 Ohio App.3d 147, 2007-Ohio-1167, ¶ 27 (10th Dist.); *Taub* at ¶ 15. A trial court's valuation and division of property will be affirmed absent an abuse of discretion. *Colley v. Colley*, 10th Dist. No. 09AP-333, 2009-Ohio-6776, ¶ 17, citing *Roberts v. Roberts*, 10th Dist. No. 08AP-27, 2008-Ohio-6121, ¶ 16. In order to find that the trial court abused its discretion, we must find more than an error of law or judgment; an abuse of discretion implies that the court's attitude is unreasonable, arbitrary or

unconscionable. *Blakemore* at 219. If there is some competent, credible evidence to support the trial court's decision, there is no abuse of discretion. *Colley* at ¶ 17, citing *Middendorf* at 401, citing *Ross v. Ross*, 64 Ohio St.2d 203 (1980).

{¶20} R.C. 3105.171(C)(1) provides that, "[i]f an equal division of marital property would be inequitable, the court shall not divide the marital property equally but instead shall divide it between the spouses in the manner the court determines equitable." Dach argues that the trial court should not have divided the marital portion of the equity in 2Checkout.com equally. In essence, Dach is again arguing that the biggest growth in the company occurred before the ceremonial date of the marriage and since she contributed time and talent to that growth, she was entitled to share in the appreciation. Dach's argument in this assignment of error focuses on the fact that the trial court did not divide the premarital portion of 2Checkout.com as marital property and thus, Homewood received more because the premarital portion of the value of 2Checkout.com remained separate property.

{¶21} In addition to the testimony during the trial, the trial court held a five-day hearing regarding the commencement date of the marriage and whether it should set a de facto commencement date. As discussed in the first assignment of error, the trial court did not find that use of the ceremonial date was inequitable. After all the evidence was presented during both hearings regarding Dach's contributions to 2Checkout.com before and after the ceremonial date, the trial court determined the extent to which both parties contributed to the success of the business and divided the resulting marital estate equally.

{¶22} Dach relies on *Speck v. Speck*, 6th Dist. No. WD-09-0005, 2009-Ohio-6684, to argue that the trial court's equal distribution is not equitable. Dach quotes *Speck*, as follows: " '[e]quitable does not mean equal.' *Id.,* citing *Cherry* [*v. Cherry*, 66 Ohio St.2d 348, (1981)] *supra*." (Dach's Brief, 23.) However, Dach misquoted *Speck*. The actual quote provides, " 'Equitable need not mean equal.' *Cherry*, 66 Ohio St.2d at 355." The actual quote indicates that the trial court has the power to divide the assets equally, or if equal is not equitable, then to divide the assets equitably. Dach's "quote" implies that an equitable division cannot be equal. However, the statute expressly provides that the trial court should divide the marital assets equally, unless such a division is inequitable. R.C. 3105.171(C)(1). In this case, the trial court did not find an equal division of the marital estate to be inequitable, rather the trial court found its

division of assets was equitable. Accordingly, Dach's second assignment of error is overruled.

### 3. Dach's Third Assignment of Error

{¶23} By her third assignment of error, Dach contends the trial court erred as a matter of law in failing to use Homewood's actual income for purposes of calculating support. According to Dach, child support and spousal support should be based on the average of Homewood's "actual annual income of $2,433,380.67" which "represents the average of [Homewood's] taxable income for 2008, 2009, and 2010, the three most recent years available at the time of trial." (Dach's Brief, 30.)

{¶24} The trial court found that Homewood's income was $580,000 per year. His salary from 2Checkout.com is $230,000. The other $350,000 per year consists of distributions from 2Checkout.com, other than the distributions used to pay taxes.

{¶25} 2Checkout.com is a subchapter corporation. A subchapter S-corporation does not pay federal income tax:

> "Rather, for federal tax purposes it is treated as a proprietorship or partnership and its annual earnings, whether distributed or not, are treated for tax purposes as if they are the personal earnings proportionately of the individual shareholders. The shareholders, therefore, pay federal income taxes on corporate earnings, rather than dividends, together with any other individual taxable income they may have. [If a party] is the sole shareholder, all corporate earnings or losses and applicable federal tax deductions, are treated for tax purposes as his personally, regardless of whether or not he has withdrawn the money represented by the corporate earnings."

*Offenberg v. Offenberg*, 8th Dist. No. 78885, 2003-Ohio-269, ¶ 27, quoting *Marcus v. Marcus*, 2d Dist. No. 98 CA 83 (July 30, 1999), quoting *Harter v. Harter*, 3d Dist. No. 1-97-55 (Feb. 26, 1998). "[A]n S Corporation is considered a 'flow through' entity whereby the income and losses of the business are nontaxable to the corporation but instead flow through to the individual shareholders." *Dupee v. Tracy*, 85 Ohio St.3d 350, 351 (1999). " 'For tax purposes, a Subchapter S Corporation differs significantly from a normal corporation in that the profits generated through the S corporation are taxed as personal income to the shareholders. The taxable income of an S corporation is computed essentially as if the corporation were an individual.' " *Id.*, quoting 26 U.S.C. 1366(b).

{¶26} R.C. 3105.18(C) requires a trial court to consider the "income of the parties from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code[.]" Spousal support is property set aside for the specific and definite purpose of supporting and maintaining the former spouse. Spousal support is an independent matter from child support. The obligation to support a spouse is based on the marriage contract and on R.C. 3103.03, which requires a married person to support his or her spouse. Awards of spousal support are not limited to meeting the needs of the requestor; rather, current Ohio law directs the trial court to use a broad standard in determining whether support is reasonable and appropriate. *Hutta v. Hutta*, 177 Ohio App.3d 414, 2008-Ohio-3756, ¶ 9 (5th Dist.), citing *Sowald and Morganstern*, Domestic Relations Law, Section 13.8 (4th Ed.2002).

{¶27} For purposes of child support, "income" is defined as "gross income." R.C. 3119.01(C)(5). A parent's gross income is "the total of all earned and unearned income from all sources during a calendar year, whether or not the income is taxable, and includes income from salaries, wages, * * * self-generated income; and potential cash flow from any source." R.C. 3119.01(C)(7). Gross income does not include "[n]onrecurring or unsustainable income or cash flow items," meaning "an income or cash flow item the parent receives in any year or for any number of years not to exceed three years that the parent does not expect to continue to receive on a regular basis." R.C. 3119.01(C)(7)(e) and (8). The General Assembly intended the definition of gross income for child support purposes to be expansive. *Wolf-Sabatino v. Sabatino*, 10th Dist. No. 10AP-1161, 2011-Ohio-6819, ¶ 91, citing *Howell v. Howell*, 167 Ohio App.3d 431, 2006-Ohio-3038, ¶ 50 (2d Dist.); *McQuinn v. McQuinn,* 110 Ohio App.3d 296, 300-01 (12th Dist.1996).

{¶28} Here, Homewood's income tax returns demonstrate a gross income of $1,947,488 in 2008, $3,775,903 in 2009 and $1,586,896 in 2010. However, the trial court found that Homewood "credibly testifie[d]" that "the distributions he received over the years were used primarily for: (1) paying taxes; (2) building and refinancing the marital residence at Choctaw Lake in London, Ohio; (3) creating the business ventures (FX Source and YELLYO) in 2005 – 2006 and (4) paying his monthly expenses (approximately $15-25,000 per month)." (Sept. 28, 2012 Decree, 43.) The trial court also found that the evidence showed that in 2010, after paying income taxes, Homewood netted approximately $578,000, which included his $230,000 annual salary and

personal distributions from the corporation. Similarly, the trial court found the evidence demonstrated that with his salary and personal distributions combined he netted "roughly $580,000" in 2011. (Sept. 28, 2012 Decree, 43.) Thus, the record reflects that the trial court examined all of the relevant evidence to ascertain Homewood's income as the sole shareholder of an S-corporation. As previously stated, Dach contends that the trial court was required to base the spousal and child support orders solely on Homewood's average gross income as reflected on his income tax returns. Dach, however, has provided no authority for such proposition. Rather case law indicates that with respect to domestic orders, " 'a court should pay particular attention to the possibility that a spouse who is the sole shareholder "creative accounting" designed to cloak not inform.' " *Offenberg* at ¶ 30, quoting *Corrigan v. Corrigan*, 8th Dist. No. 74088 (May 13, 1999). Here, there is no indication that Homewood is engaging in such behavior and trying to "cloak" net income. Instead, the record reflects that Homewood provided evidence of what his income has been and the record reflects that the trial court examined this evidence to determine Homewood's income.

{¶29} We find no merit to Dach's argument that the trial court was required, as a matter of law, to rely solely on Homewood's federal income tax returns to determine Homewood's income as the sole shareholder of an S-corporation. Accordingly, we overrule Dach's third assignment of error.

**4. Dach's Fourth Assignment of Error**

{¶30} By her fourth assignment of error, Dach contends the trial court erred in finding that Homewood had a separate property interest in the joint UBS accounts. The parties stipulated that the UBS investment account had a value of $1,738,995 on December 31, 2010, the agreed termination date of the marriage for valuing the marital estate. Homewood claimed a premarital separate interest in the account as a result of an income tax refund of $264,329 received in 2005 from his 2004 income taxes. The trial court found that Homewood's 2004 income tax return established his claim to separate property.

{¶31} In a divorce proceeding, property is divided pursuant to R.C. 3105.171. First, the trial court must "determine what constitutes marital property and what constitutes separate property." R.C. 3105.171(B). The court then divides "the marital and separate property equitably between the spouses" in accordance with the statute,

disbursing a spouse's separate property to that spouse unless otherwise directed under the statute.  R.C. 3105.171(B) and (D).  "Marital property" includes, as relevant here, (1) "[a]ll real and personal property that currently is owned by either or both of the spouses * * * that was acquired by either or both of the spouses during the marriage," (2) "[a]ll interest that either or both of the spouses currently has in any real or personal property * * * that was acquired by either or both of the spouses during the marriage," and (3) "all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage." R.C. 3105.171(A)(3)(a)(i), (ii) and (iii).  Thus, "when *either* spouse makes a labor, money, or in-kind contribution that causes an increase in the value of separate property, that increase in value is deemed marital property." (Emphasis sic.) *Middendorf* at 400.

{¶32} Marital property does not include any separate property. R.C. 3105.171(A)(3)(b).  "Separate property," is "[a]ny real or personal property or interest in real or personal property that was acquired by one spouse prior to the date of marriage," and "[p]assive income and appreciation acquired from separate property by one spouse during the marriage."  R.C. 3105.171(A)(6)(a)(ii) and (iii).

{¶33}  If the parties contest whether an asset is marital or separate property, the asset is presumed marital property, unless it is proven otherwise. *Miller v. Miller*, 7th Dist. No. 08 JE 26, 2009-Ohio-3330, ¶ 20, quoting *Sanor v. Sanor*, 7th Dist. No. 2001CO37, 2002-Ohio-5248, ¶ 53.  "The commingling of separate property with other property of any type does not destroy the identity of the separate property as separate property, except when the separate property is not traceable."  R.C. 3105.171(A)(6)(b).  The ability to trace the funds is "the focus when determining whether separate property has lost its separate character after being commingled with marital property."  *Peck v. Peck,* 96 Ohio App.3d 731, 734 (12th Dist.1994).  A party requesting that an asset be classified as separate property bears the burden of tracing that asset to his or her separate property.  *Dunham* at ¶ 20.  "A trial court's determination of whether property is marital or separate property will not be overturned unless it is against the manifest weight of the evidence." *Id.* at ¶ 20, citing *An v. Manson*, 10th Dist. No. 06AP-90, 2006-Ohio-6733.

{¶34}  Dach argues that since the parties were married on June 1, 2004, some portion if not all of the refund is marital property.  Homewood testified that the funds

from his tax refund were placed into this account.  (Tr. 1070.)  He stated, "[t]hat account was primarily from overpayment of taxes.  It was a large refund.  This calculation of taxes in early years was not very sophisticated, and it was totally based off the previous year and wildly inaccurate." (Tr. 1369.)  The testimony established that Homewood paid his taxes by taking distributions from 2Checkout.com.  Dach testified that prior to 2008, Homewood's distributions or draws were taken from retained earnings, not current year earnings.  Dach stated:

> A. * * * I believe Brad and I both issued a warning in either 2008 or 2009 that for the first time he was not drawing or assumed not to be drawing off of retained earnings but would actually be drawing off of current years' profit.
>
> * * *
>
> A. As far as 2Checkout.com was concerned, distributions were always drawn off of retained earnings, which was the profit booked but not distributions in the year it was generated.  At one point, you know, we were dealing with multiple years of retained earning[s] at least from the balance sheet and profit and loss statement perspective, its net profitability.
>
> * * *
>
> A. * * * I have no personal knowledge of current practices, but that is not how we did it while I was CFO at 2Checkout because draws would be booked against retained earnings not the current shares' estimated profits.
>
> * * *
>
> Q. And it's your testimony there were retained earnings in the business from which Alan drew?
>
> A. Yes.
>
> Q. And those were based on the prior year – prior years' numbers?
>
> A. Or multiple prior years.

(Tr. 582-84.)

{¶35}  Thus, the money used to pay the taxes was based on prior years' retained earnings.  Any tax refund received in 2005, was based on taxes paid in 2004.  However,

the funds used to pay such taxes were drawn from earnings from prior years, not 2004, according to Dach's testimony. Thus, the trial court did not err in finding that Homewood traced the separate property because it is not against the manifest weight of the evidence. Dach's fourth assignment of error is overruled.

### 5. Dach's Fifth Assignment of Error

{¶36} By her fifth assignment of error, Dach contends that the trial court abused its discretion in finding that 2Checkout.com had a value of $12,000,000 in 2004. As stated above, a domestic court has broad discretion to make divisions of property and if there is some competent, credible evidence to support the trial court's decision, there is no abuse of discretion. "Rigid rules to determine value cannot be established, as equity depends on the totality of the circumstances. * * * A court should not review discrete aspects of the property division out of the context of the entire award. * * * A court should consider whether the trial court's disposition of marital property as a whole resulted in a property division which was an abuse of discretion." (Citations omitted.) *Baker v. Baker*, 83 Ohio App.3d 700, 700-01 (9th Dist.1992).

{¶37} Both parties presented experts who valued 2Checkout.com in 2004, at the beginning of the marriage, and in 2010, at the end of the marriage. The trial court adopted the valuation of Homewood's expert for 2004 ($12 million) and adopted the valuation of Dach's expert for 2010 ($17.5 million). "An appellate court will not reverse a trial court's decision regarding what figures it uses to determine an equitable division where the decision is supported by the manifest weight of the evidence, and it is supported by competent and credible evidence." *Dollries v. Dollries*, 12th Dist. No. CA2012-08-167, 2014-Ohio-1883, ¶ 10.

{¶38} For the valuation in 2004, both experts used the capitalization of cash flow method. Dach's expert, Ickert, determined the value was $8 million. Homewood's expert, McDaniel, determined the value was $12 million. Ickert described the process of business valuations as using the history of the business to provide an idea of the value of the company and project its future. (Tr. 655.) McDaniel described the income approach involving the asset "being appraised is viewed primarily from the standpoint of its investment characteristics. This approach assumes that a buyer is interested in an investment that matches the buyer's desired level of investment returns and acceptable level of riskiness. The main drivers to value using this approach is determining the

future benefit stream (cash flow or earnings) and then determining the appropriate rate of return related to that benefit stream." (Summary Valuation Report as of June 1, 2004, by Rea & Associates, exhibit YY, I-2.)

{¶39} The differences between the experts' valuations are mainly based upon the assumptions the experts made in arriving at the value, including how the earning stream is determined and the calculation of the capitalization rate. (Tr. 677; 1037.) Dach's expert, Ickert, testified that the main difference was the capitalization rate or the rate of return that is applied to the future cash stream. The capitalization rate is based on the specific company risk and the growth rate used.

{¶40} Ickert used a growth rate of the American Gross National Product and Homewood's expert, McDaniel, used a 2004 growth rate of 8.3 percent. Ickert testified that he attempted to neutralize the subjective nature of the growth rate used to calculate the capitalization rate on which the valuations were based, as follows:

> I can take the judgment factor out of this. 3.2 percent, what happens to be is the 70-year long-term growth rate of the gross national product. I used 3.2 percent in 2004. As we will discuss, I used 3.2 -- 3.2 percent in 2010 also. What that does is take that element, highly subjective judgmental element, I neutralize it. I take it out. My estimate of growth rate has nothing to do with determining the marital property in this case, so I neutralize it. Mr. McDaniel on the other hand comes up with 8.3 percent.

(Tr. 687-88.)

{¶41} Ickert explained the impact of the growth rate, as follows: "Well, the impact is it reduces the capitalization rate further which increases the value. That is largely why Mr. McDaniel has a larger value for 2004 than I do." (Tr. 690.) McDaniel agreed that the biggest difference between the two reports in 2004 was the capitalization rate. (Tr. 1037.) Ickert used a capitalization rate of 16.7 and McDaniel used 11.5. There is an inverse relationship of the capitalization rate to value, meaning a higher capitalization rate results in a lower value. (Tr. 1035.) McDaniel testified that the difference was two factors, the growth factor (8.3 percent rate vs. 3.2 percent) and the specific company risk factor. (Tr. 1038.)

{¶42} Ickert used the same growth factor for the two valuations and he testified that doing so, he, in essence, neutralized the factor. However, McDaniel testified that he

believed the company had a larger growth in 2004 than in 2010 and it was not appropriate to use the same number for both years.

{¶43} McDaniel explained that he determined the risk factor through discussions with 2Checkout.com's management in order to develop an understanding of the business and the risks that would concern a potential buyer. McDaniel looked at the competition in the market which he testified had substantially increased in 2010 over 2004. Ickert determined that competition was not a significant factor because every business faces competition. McDaniel also testified concerning new technology displacement as an ongoing concern. A third risk factor McDaniel considered was state sales tax (states are beginning to collect sales tax from online retailers) and compliance issues with differing states which increase expenses.[3]

{¶44} Dach contends that the trial court's reliance on McDaniel's valuation was an abuse of its discretion, arbitrary and without any rational evidentiary basis. However, the trial court had credible evidence before it establishing the value of the business. Dach stipulated that McDaniel was an expert on corporate valuations. McDaniel's report states that in arriving at a value, he analyzed the audited financial statement for 2004 and the tax returns for 2001-2004, researched industry data and trends, interviewed management, and prepared value estimates based on asset value, income streams and market data information. (Summary Valuation Report as of June 1, 2004, by Rea & Associates, exhibit YY, I-1.) He visited the business several times. When he testified, McDaniel stated that interviewing Homewood was his best source of historical information for the 2004 valuation. He also specifically mentioned interviewing the controller. McDaniel testified regarding the differences between the reports and the factors involved. The trial court specifically found McDaniel's 2004 report more persuasive because few of the criticisms that Ickert exposed in McDaniel's 2010 report existed in McDaniel's 2004 report and Ickert's 2004 analysis was not as thorough a retrospective analysis as McDaniel's analysis.

{¶45} Ickert criticized McDaniel's 2010 report because it focused on factors that are expected to occur post-decree. He believes the discounted cash flow method is an inappropriate method of valuation in a domestic relations case because typically a five-year projection is discounted back to arrive at such a value. Such forward-thinking

---

[3] McDaniel testified to more risk factors applicable to the 2010 valuation.

projections are post-decree, thus, he believes inappropriate. (Tr. 647-48.) The discounted cash flow method uses the company's own projections for five years and calculates a value based on those projections. (Tr. 696.) Ickert criticized McDaniel's $3,356,000 normalized Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") because McDaniel used the five-year period 2005 through 2009 and calculated an average for normalized EBITDA, but then calculated normalized EBITDA for 2011 and averaged those two figures. (Tr. 706.) In contrast, Ickert used an average of 2006-2008 and 2011 (both experts excluded 2010 as a transitional year). Ickert also used actual financial statements to determine working capital needs rather than a projected number. This resulted in a difference of the two experts' reports as to the future sustainable net cash flows. When the capitalization rate was applied, it resulted in a $2.5 million difference between the two reports.

{¶46} Finally, Ickert again criticized McDaniel's specific company risk factors and the growth rate. (Tr. 710-19.) The trial court found Ickert's criticism of McDaniel's specific company risk factors persuasive. Ickert specifically argued that the use of 5.5 percent was inappropriate. The trial court focused on the fact that McDaniel assigned 0.5 percent risk to the lawsuit risk based on a specific VISA compliance issue which resulted from a specific client, PASHE. PASHE was no longer a client and an independent auditor's report (exhibit No. 3) indicated that management believed all the legal proceedings would be adequately covered by insurance or without merit or would not have a significant effect on the financial position of 2Checkout.com. Thus, the percentage assigned to that risk factor was too high.

{¶47} The trial court also acknowledged that Ickert's method of calculating EBITDA (averaging five years to calculate normalized EBITDA), rather than McDaniel's method (averaging 2005-2009 and calculating normalized EBITDA for 2011 and then averaging those two figures) did not require an adjustment to acknowledge the volatility of earnings.

{¶48} Finally, the trial court found Ickert's criticism of McDaniel's method regarding McDaniel's liquidity concerns valid. McDaniel adjusted the risk factors one percent because 2Checkout.com had very little liquidity. However, Ickert responded that 2Checkout.com historically had little liquidity yet had been successful for ten years. Ickert also argued that 2Checkout.com never had long-term, interest-bearing debt and

Homewood's distributions totaled approximately $18 million between 2001 and 2010. These facts produced another percentage that was too high. The specific company risk results in a difference in the capitalization rate. As stated previously, there is an inverse relationship that exists between the capitalization rate and the total value. Thus, the trial court found Ickert's criticisms of McDaniel's 2010 calculations persuasive.

{¶49} We cannot say that the trial court's decision in choosing to rely on McDaniel's 2004 valuation has no sound reasoning process to support it. When parties present substantially different valuations of an asset, the trial court is free to believe all, part, or none of any witnesses' testimony. *Huelskamp v. Huelskamp*, 185 Ohio App.3d 611, 2009-Ohio-6864, ¶ 27 (3d Dist.), quoting *Covert v. Covert*, 4th Dist. No. 03CA778, 2004-Ohio-3534, ¶ 29. And when applying the abuse of discretion standard of review, an appellate court may not substitute its judgment for that of the trial court, thus, the trial court did not abuse its discretion and Dach's fifth assignment of error is overruled.

### 6. Dach's Sixth Assignment of Error

{¶50} In the trial court proceedings, both parties sought an award of attorney fees. The trial court, however, declined to award attorney fees to either party, and found it equitable for each party to pay their own attorney fees and litigation costs. By her sixth assignment of error, Dach contends that the trial court abused its discretion in failing to award attorney fees to her.

{¶51} The decision whether to award attorney fees in a divorce action is within the sound discretion of the trial court. *Rand v. Rand*, 18 Ohio St.3d 356, 359 (1985). R.C. 3105.73(A) addresses attorney fees, as follows:

> In an action for divorce, dissolution, legal separation, or annulment of marriage or an appeal of that action, a court may award all or part of reasonable attorney's fees and litigation expenses to either party if the court finds the award equitable. In determining whether an award is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate.

{¶52} In the present case, Dach argues that denying her request for attorney fees was an abuse of discretion because there is a large disparity in income between the parties, there is a large disparity in the distribution of assets, and Homewood delayed

discovery. The trial court examined these issues and determined that an award of attorney fees was not warranted.

{¶53} The trial court noted that Homewood was current in all of his court-ordered support obligations, which included temporary spousal support in the amount of $15,000 per month beginning in January of 2011. The trial court also noted that Homewood prepaid a portion of Dach's attorney fees in the amount of $20,000. Additionally, though both parties argued that the other party delayed the proceedings, the trial court specifically found that neither party engaged in openly inappropriate or obvious dilatory tactics. The trial court also considered the marital assets and income of the parties. The court stated that it considered the statutory factors and the totality of the circumstances and found that, despite the disparity in income, it arrived at what it believed to be an equitable distribution of marital assets, liabilities and income. Thus, the trial court found it equitable for the parties to pay their own attorney fees and costs of litigation.

{¶54} Dach reargues that the trial court's imputing income to her is an error because she had received no income since December 2010 from 2Checkout.com. Dach also contends that the distribution of assets, especially 2Checkout.com, was inequitable. Both of these issues have been addressed in other assignments of error. The trial court examined the incomes of the parties and the distribution of assets before concluding that an award of attorney fees was not warranted.

{¶55} Finally, Dach argues that she testified regarding delays in discovery caused by Homewood and corporate counsel for 2Checkout.com regarding a protective order. The trial court also commented that Dach's request for a de facto commencement date of the marriage could be considered a delay. However, the trial court heard the testimony regarding all the delays and found neither party engaged in openly inappropriate or obvious dilatory tactics. We cannot say that the trial court abused its discretion. The trial court examined the appropriate factors and found an award of attorney fees was not warranted. Dach's sixth assignment of error is overruled.

### 7. Dach's Seventh Assignment of Error

{¶56} By her seventh assignment of error, Dach contends that the trial court erred when it imputed income to her. The trial court found that Dach's income for purposes of calculating child and spousal support to be $138,092. Dach left her

employment at 2Checkout.com in July 2010 and had received no further income from 2Checkout.com since December 2010 and had not found further employment. Dach does not challenge the amount of $138,092, but, rather, Dach contends the trial court erred by failing to include an express statement that she was voluntarily unemployed.

{¶57} This court has held that before a trial court may impute income to a parent, the court must make a finding that the parent is voluntarily unemployed or underemployed. *Bruno v. Bruno*, 10th Dist, No. 04AP-1381, 2005-Ohio-3812, citing *Apps v. Apps*, 10th Dist. No. 02AP-1072, 2003-Ohio-7154, ¶ 48. However, more recently, this court has distinguished those cases. In *Chawla v. Chawla*, 10th Dist. No. 13AP-399, 2014-Ohio-1188, finding that when the trial court considered the R.C. 3119.01(C)(11) factors, provided rationale for its imputed income and the record demonstrated evidence to support a finding of voluntary underemployment, this court found no abuse of discretion in calculating the child support obligation. *See also*, *Thaher v. Hamed*, 10th Dist. No. 09AP-970, 2010-Ohio-5257 (specific words "voluntarily underemployed" not required where it is clear the trial court concluded that, based on the evidence, the obligor was voluntarily underemployed); *Snyder v. Snyder*, 5th Dist. No. 2008CA00219, 2009-Ohio-5292 (no magic language requirement in deciding whether one is voluntarily underemployed or unemployed); *Winkleman v. Winkleman*, 11th Dist. No. 20008-G-2834, 2008-Ohio-6557 (no magic language required in making a finding of voluntary unemployment or underemployment and implicit in the trial court's decision was that the parent was voluntarily unemployed); *Drummer* (while the better practice would be to expressly find a parent unemployed or underemployed, it is not reversible error to fail to make an express finding for purposes of imputing income to the parent when the reviewing court is capable of inferring such a finding from the record). *See also O'Connor v. O'Connor*, 184 Ohio App.3d 538 (3d Dist.2009); *Wheeler v. Wheeler*, 6th Dist. No. OT-04-025, 2005-Ohio-1025, ¶ 26.

{¶58} Here, the trial court considered the incomes and relative earning abilities of the parties and provided its rationale for the imputed income. The record in this case contains evidence from which we can infer the trial court made the finding that Dach is voluntarily unemployed. Dach testified that she resigned her position at 2Checkout.com after filing for divorce. She initially testified that she was asked to resign, but then explained that she and Homewood determined during marriage counseling that if the

marriage failed, it was not beneficial for either of them to continue working together. (Tr. 252-53.)  The Chief Executive Officer, Tom Dailey, Jr., testified that he did not ask Dach to resign.  (Tr. 175.)  Dach testified she preferred not to go back to work and would prefer to be at home with their daughter, who has special needs and requires constant supervision.  (Tr. 397-98; 573.)  However, she also testified that she wants to return to school and earn a Bachelor of Arts degree in Communications.  Dach plans to start at the University of Phoenix online and tuition is $17,000-18,000 per year and it will take her approximately 5 years to complete the degree.  (Tr. 465-67.)  Dach was earning between $35,000-50,000 before she met Homewood and approximately $135,000, plus a bonus in 2010.

{¶59}  The record is clear that the trial court considered the relevant statutes and provided rationale for its imputed income.  Additionally, the record contains evidence to support a finding of voluntary unemployment.  Thus, despite failing to make an express finding of voluntary unemployment, we find that the trial court did not abuse its discretion in finding that Dach was voluntarily unemployed and in imputing income to her.  Accordingly, Dach's seventh assignment of error is overruled.

### 8. Dach's Eighth Assignment of Error

{¶60}  By her eighth assignment of error, Dach contends that the trial court erred in finding that the value of the household goods and furnishings was $59,002. The parties built an 8,000 square foot house and furnished it with expensive furnishings, many of which were custom made.  Dach offered the expert testimony of Robert Cassel, who estimated the value of the goods and furnishings at $322,500.  In contrast, Homewood offered the expert testimony of Mike Brandly, who estimated the value of the goods and furnishings at $59,002.  Dach contends that the trial court abused its discretion in valuing the goods and furnishings at $59,002 because the parties purchased these items at a price of approximately $850,000 and they had a higher value than $59,002.

{¶61}  As stated above, a domestic court has broad discretion to make divisions of property.  *Cherry* at 355.  It is axiomatic that, before distributing the marital assets, the trial court must value the assets in order to achieve an equal and/or equitable distribution.  *Meeks v. Meeks*, 10th Dist. No. 05AP-315, 2006-Ohio-642, citing *Hightower v. Hightower*, 10th Dist. No. 02AP-37, 2002-Ohio-5488, ¶ 22.  A trial court's

determination of valuation based on competent, credible evidence will be upheld absent an abuse of discretion.  *Sherman v. Sherman*, 10th Dist. No. 05AP-757, 2006-Ohio-2309, ¶ 7, citing *Moro v. Moro*, 68 Ohio App.3d 630, 637 (8th Dist.1990).

{¶62}  Dach's expert, Cassel, is the owner of a Cassel & Associates Realtors and Auctioneers, a real estate brokerage firm that specializes in auctions and liquidations. Cassel visited the marital residence and inspected the household goods and furnishings. He spent approximately 90 minutes in the home and looked at the main items.  Cassel did not tour every room in the home and was not retained to perform an appraisal of every item, however, he did take photographs and notes.  Cassel prepared a report containing his valuations of the fair market value which he defined as the value of the items if sold at an auction or liquidation of that inventory.  Dach provided him with a spreadsheet (exhibit No. 7) which was a retail invoice of the items purchased by the decorator and the original purchase prices.  On cross-examination, there were several inaccuracies exposed in Cassel's report, such as items being double counted and valued or the decorator's labor being valued as an item.

{¶63}  Homewood's expert, Brandly, also visited the marital home to value the items.  Some of the items in Cassel's report were no longer in the house.  Brandly spent several hours creating an inventory of the items.  Neither expert valued every item in the house.

{¶64}  The trial court found that both experts had difficulty in describing their charge and both lacked thoroughness.  The trial court found Brandly's experience more applicable to a domestic relations proceeding than Cassel's experience and the trial court found Brandly's report and testimony more detailed and credible.

{¶65}  Brandly testified that he is an auctioneer and an appraiser. (Tr. 1225.) After college, he graduated from Missouri Auction School in Kansas City, Missouri and is a member of the Certified Appraisers Guild of America, a personal property appraisal certification and designation. (Tr. 1226.) Brandly has testified in court as an expert in appraising personal property at least 50 times. (Tr. 1228.) Brandly stated that he received a copy of Cassel's report, minus Cassel's valuations and then he walked through the house, looked at the items and wrote down descriptions of the items and his initial impression values.  Brandly then went back to his office to complete computer research. Brandly used the sales comparison method to value the items at fair market value and

that process involved looking for items of like kind that have sold recently to determine the fair market value of the items. (Tr. 1236.)   According to Brandly, the sales comparison method of valuing items is the preferred method.  Brandly looked online at several websites to find similar items, for example eBay, WorthPoint, Artfact Live (part of AuctionZip), and other auctioneer websites that publish results of recent sales.  (Tr. 1238-1240.) Brandly also testified that he did not value all of the items on Cassel's list because some of the items were items he could not appraise (such as labor), some items were no longer in the house, and some items were attached to the house (such as the bar). Brandly also explained that custom made items often have a lower value because they are a custom size, color or texture and it narrows the buyer market.  Additionally, Brandly explained that a buyer who has a $4,500 budget for bedding (as Cassel valued), would most likely purchase new bedding, not used bedding.  (Tr. 1250-1252.)

{¶66} Dach complains because Brandly was unable to recall specific details regarding the items he valued. However, Dach's expert, Cassell, also had trouble remembering details regarding things he had valued and items he grouped together.  As stated, on cross-examination, there were several inaccuracies exposed in Cassel's report, such as items being double counted and valued or the decorator's labor being valued as an item.

{¶67}  Brandly testified concerning items that he would not appraise because it is not customary to appraise them separately. Cassel's report appraised bar stools, but also had line items for nailheads that were installed on the barstools. Also, there was a separate line for replating the footrests.  Brandly stated the nailheads become part of the barstool and should not be appraised separately and the labor likewise would not be appraised, but would be included in the barstool valuation. (Tr. 1246-47.) Other examples of labor include picture and drapery hanging which were line items on Cassell's valuation. (Tr. 1249.) Another example of items that should not be appraised separately were items attached to the real property and likely considered real property, not personal property.  Brandly provided examples such as the game room bar and the mirror. (Tr. 1247.) He also referenced the powder room countertop and mirror. (Tr. 1272.) Cassell also appraised a brown leather rug in the loft at $3,000, yet the rug was not in the house the day he was there.

{¶68} Cassell testified concerning such inaccuracies in his report.   On cross-examination he explained that the items listed in his report were listed and described exactly as in exhibit No. 7, which was the spreadsheet and purchase price submitted by the interior decorator.   Cassell explained that he created his report in his handwriting and his secretary created an Excel spreadsheet using the descriptions from exhibit No. 7. (Tr. 819.) He stated he worked from the descriptions and used exhibit No. 7 as a reference.   (Tr. 821.)

{¶69} Cassell also testified that certain items might be appraised twice on his report.   An example is the JANUS patio furniture for $35,000 and the "JANUS patio furniture damaged replacement" for $25,000.   (Tr. 852-853.)   He did not know how such items such as labor had been given values because he did not appraise them, although the amounts were listed on his report.

{¶70} Dach also argues that Brandly's valuation was inaccurate because Homewood testified he would not sell the items to Dach for $59,000.   (Tr. 1385-86.) However, Homewood also testified that he believed Brandly's valuation was correct and he wished the items to remain with the marital residence because most were custom made for the house.

{¶71} The trial court found Brandly's work experience more applicable to a domestic relations proceeding and his report and testimony more detailed and credible than Cassel's.   It is not the job of the appellate court to reweigh the evidence.   Given the inconsistencies and errors in Cassell's report, the record contains competent, credible evidence to support the trial court's findings.   Accordingly, Dach's eighth assignment of error is overruled.

## D. HOMEWOOD'S APPEAL

### 1. Homewood's First, Second, and Third Assignments of Error

{¶72} Homewood's first three assignments of error arise from the trial court's disposition of issues concerning three rental properties.   By his first assignment of error, Homewood argues that the trial court erred in finding that he agreed that marital monies were used to pay the principal balance on the loans of four rental properties.   By his second assignment of error, Homewood contends that the trial court erred in sua sponte creating a procedurally improper process under which he was required to submit "proposed accountings" under penalty of forfeiting his marital interest in the four rental

properties. By his third assignment of error, Homewood contends that the trial court applied a coverture fraction to the erroneously-determined marital component of the value of each of the four rental properties. For ease of discussion, we will address these three assignments of error together.

{¶73} In the original divorce decree, the trial court found that the four rental properties at issue here[4] were Homewood's separate property. In its addendum to the decree of divorce, the trial court found that Homewood acknowledged that some marital funds were used to maintain these properties. The trial court then computed the percentage of months owned as separate property to the total number of months the property was owned and used that percentage to determine the marital portion of the equity. For example, for 1930 Yuma Drive, the trial court determined Homewood owned the property separately for 13 of the 104 months (13 months premarital and 91 months marital) and thus, 13 percent of the $6,475 equity is his separate property and $5,633 is the marital portion of the equity.

{¶74} Initially, Homewood contends that the trial court erred in finding that the parties agreed that marital monies were used to reduce the principal balance on these properties. However, Homewood testified, as follows:

> Q. Okay. And this would be the mortgage for 1930 Yuma Drive?
>
> A. Yes.
>
> Q. And this was paid down during the marriage, was it?
>
> A. Yes. I mean, before and during. Yes.

(Tr. 192.)

{¶75} Homewood testified that the mortgage on each of the properties was paid during the marriage. "All mortgage payments on all of the properties have been paid each month from the date that the mortgage was opened until today." (Tr. 197; 193; 198.) Thus, Homewood acknowledged that the principal balance on the mortgages was paid during the marriage. Homewood contends that he used separate funds to pay the mortgages. The trial court afforded Homewood the opportunity to prove the mortgages

---

[4] The four rental properties are: 1930 Yuma Drive; 2385 West Choctaw Drive; 1845 Huron Drive; 1860 Chickasaw Drive, all in London, Ohio.

were paid with separate funds. At the end of the trial, the trial court ordered the parties to provide the court with accountings that would document the reduction in principal through marital funds or the court would deem his argument as to separate property waived and the entire equity would be treated as marital. Homewood argues that this procedure violated his due process rights and violated Civ.R. 75.[5]

{¶76} In the prior appeal, this court agreed that the procedure violated Civ.R. 75 and dismissed the appeals for lack of a final, appealable order. Upon remand, the trial court entered an Addendum to the Judgment Entry where it divided the separate and marital equity from the properties. Any issues related to Civ.R. 75 are now moot. Further, while the preferred method for the trial court was to proceed with the trial and receive evidence related to the properties, Homewood has not demonstrated that the error was not harmless or that it violated his due process rights. Homewood had the burden to prove that separate funds were used, he was given the opportunity to do so, but failed to meet that burden. "Due process requires notice, hearing, and the opportunity to be heard, which of necessity includes the opportunity to present evidence." *Ardrey v. Barks*, 10th Dist. No. 78AP-762 (June 19, 1979.) The trial court provided such to Homewood and his due process rights were not violated.

{¶77} As stated above, R.C. 3105.171(A)(3)(a)(i) and (iii) define "Marital property" as, (3) "all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage." Thus, "when *either* spouse makes a labor, money, or in-kind contribution that causes an increase in the value of separate property, that increase in value is deemed marital property." (Emphasis sic.) *Middendorf* at 400. Homewood had the burden of proving that the money used to pay the mortgages was separate because a party requesting that an asset be classified as separate property bears the burden of tracing that asset to his or her separate property. *Dunham* at ¶ 20. "A trial

---

[5] Civ.R. 75(F) provides requirements for a trial court in entering judgment, as follows: "For purposes of Civ.R. 54(B), the court shall not enter final judgment as to a claim for divorce, dissolution of marriage, annulment, or legal separation unless one of the following applies: (1) The judgment also divides the property of the parties, determines the appropriateness of an order of spousal support, and, where applicable, either allocates parental rights and responsibilities, including payment of child support, between the parties or orders shared parenting of minor children; (2) Issues of property division, spousal support, and allocation of parental rights and responsibilities or shared parenting have been finally determined in orders, previously entered by the court, that are incorporated into the judgment; (3) The court includes in the judgment the express determination required by Civ.R. 54(B) and a final determination that either of the following applies: (a) The court lacks jurisdiction to determine such issues; (b) In a legal separation action, the division of the property of the parties would be inappropriate at that time."

court's determination of whether property is marital or separate property will not be overturned unless it is against the manifest weight of the evidence." *Id.*

{¶78} Homewood failed to meet that burden. He testified that the mortgages were paid during the marriage. He testified that the rental properties did not generate income, as follows:

> Q. Do you also derive certain incomes from the various real estate parcels that you have?
>
> A. No. If you are referring to the rental properties I have, in a year they - - I would be lucky if they broke even.

(Tr. 216.)

{¶79} Dach testified that the mortgages were paid from the parties' incomes, as follows:

> Q. Okay. Now, with respect to the ones that were paid down during the marriage, do you know where the money came from to pay those mortgages down?
>
> A. From our income.
>
> Q. Our being you and Alan?
>
> A. Yes.

(Tr. 347.)

{¶80} There was no testimony that the mortgages were paid with separate funds or assets. In his supplemental memorandum, Homewood contends that the rents from the rental properties were used to pay the mortgages. (Supplemental Memorandum, Oct. 29, 2012, 2; exhibit A.) Homewood also contends that if any marital funds were used, it was for repair and maintenance of the properties. As the trial court noted, this information directly contradicts his testimony during the trial. "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123 (1986), overruled on other grounds; *In re M.D.*, 38 Ohio St.3d 149 (1988). We find the trial court did not err in finding that marital monies were used to pay the principal balance of the loans on the four rental properties.

Whether Homewood agreed or not, the evidence supports the finding that marital funds were used.

{¶81} Homewood contends that the trial court erred by applying a coverture fraction to the erroneously-determined marital component of the value of each of the four rental properties. Typically, the coverture fraction method has been used to determine the value of pensions and retirement funds. As stated, before a trial court divides marital and separate property, it must first determine the value of the assets. In valuing a marital asset, a trial court is neither required to use a particular valuation method nor precluded from using any method. *Clymer v. Clymer*, 10th Dist. No. 99AP-924 (Sept. 21, 2000), citing *James v. James*, 101 Ohio App.3d 668, 681 (1995). There are no rigid rules used by courts to determine value as equity depends on the totality of the circumstances. *Baker v. Baker*, 83 Ohio App.3d 700 (9th Dist.1992).

{¶82} The parties stipulated as to the value of each of the properties as of December 31, 2010 (the stipulated de facto termination date of the marriage for valuation purposes). The trial court subtracted the mortgage encumbrance from the total stipulated value to derive the equity. For example, the 1930 Yuma Drive property value was stipulated as $112,420 and the mortgage was $105,945. Then the trial court determined that Homewood owned the property for 13 months premarital and 91 months marital and awarded Homewood 13 percent of the $6,475 equity as separate property and $5,633 as marital property. As the trial court is neither required to use a particular valuation method nor precluded from using any method, there is no abuse of discretion in the trial court's method of determining marital value.

{¶83} Homewood argues that the trial court failed to recognize any down payment that he may have put on each property, which would constitute separate property. However, Homewood did not present any evidence of down payments. In fact, exhibit A attached to his supplemental memoranda is a chart of the properties setting forth the rents received, the operating expenses, rent minus expenses, and the principal values. The exhibit provides that the marital equity is the total invested after rents received. Homewood cannot complain that the trial court did not account for any down payments when he did not present evidence of such. On his exhibits, he does not claim any down payment or separate money for any of the properties.

{¶84} For all of the foregoing reasons, Homewood's first, second and third assignments of error are overruled.

### 2. Homewood's Fourth Assignment of Error

{¶85} By his fourth assignment of error, Homewood contends that the trial court erred in finding all of the income and appreciation in value of the UBS account to be marital, even though some of that income and appreciation by statute must be his separate property. The trial court found that $264,329 of the $1,738,995 was Homewood's separate property, and the trial court awarded $1,474,666 to Dach. Homewood argues that the trial court failed to account for passive appreciation in the UBS account and that portion above his separate property is not all marital property.

{¶86} R.C. 3105.171(A)(6)(a) defines separate property as "[p]assive income and appreciation acquired from separate property by one spouse during the marriage." "Marital property" includes, as relevant here, "all income and appreciation on separate property, due to the labor, monetary, or in-kind contribution of either or both of the spouses that occurred during the marriage." R.C. 3105.171(A)(3)(a)(iii).

{¶87} The investment value has some increase due to the passive income and appreciation due to the $264,329 separate property of Homewood. However, the parties provided no evidence that would assist the trial court to determine such value. The only evidence presented to the trial court included evidence that the tax return used to partly fund this account was Homewood's separate property and the parties presented the 2010 year-end summary of the account. However, there was no other evidence regarding any deposits the parties made to the account while it was open, or what amount constituted the passive appreciation. The trial court cannot be expected to determine those amounts without any evidence.

{¶88} Furthermore, in Appendix B to his closing argument to the trial court, Homewood argued that $151,000 was his separate property and that Dach should retain the remaining balance and it should be offset by the property division. Homewood received more than he argued he should receive since he was awarded $264,329 as separate property. Homewood cannot now reasonably argue to this court that the trial court should have awarded him more when the trial court actually did award him more than he argued he should receive. Accordingly, Homewood's fourth assignment of error is overruled.

### 3. Homewood's Fifth Assignment of Error

{¶89}  By his fifth assignment of error, Homewood contends that the award of spousal support is excessive, unreasonable and inappropriate. The trial court considered the R.C. 3105.18(C)(1) factors and found sufficient evidence for an award of rehabilitative spousal support and ordered Homewood to pay $8,000 per month, plus processing charge, for 30 months.

{¶90}  R.C. 3105.18(C)(1) provides 14 factors for the trial court to consider before awarding spousal support, as follows:

> (a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;
>
> (b) The relative earning abilities of the parties;
>
> (c) The ages and the physical, mental, and emotional conditions of the parties;
>
> (d) The retirement benefits of the parties;
>
> (e) The duration of the marriage;
>
> (f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;
>
> (g) The standard of living of the parties established during the marriage;
>
> (h) The relative extent of education of the parties;
>
> (i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;
>
> (j) The contribution of each party to the education, training, or earning ability of the other party, including but not limited to, any party's contribution to the acquisition of a professional degree of the other party;
>
> (k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

{¶91} The trial court examined all of the factors in depth. As we have previously stated, the trial court established Dach's income at $138,092 and Homewood's income at $580,000 per year. We have already overruled the assignments of error challenging the trial court's income determination for both Dach and Homewood. The testimony regarding the factors provides the following facts that the trial court relied upon. Dach testified that both parties are in good physical and mental health and Homewood did not testify to the contrary. Dach was awarded a majority of the parties' retirement assets. Even though the parties stipulated that December 31, 2010 was the de facto termination date for purposes of valuing the marital estate, the agreement did not extend to spousal support, therefore, the trial court determined that the duration of the marriage was from June 1, 2004 until January 24, 2012 for spousal support purposes. The parties' daughter has medical issues and requires constant supervision. Dach is the child's primary caregiver. Dach has not worked since leaving 2Checkout.com and her salary prior to working at 2Checkout.com was in the range of $35,000-50,000, not the six-figure income she made at 2Checkout.com. Homewood has a Bachelor of Science degree from The Ohio State University, but Dach testified that she intends to earn a Bachelor's degree online and that tuition is approximately $18,000 per year.

{¶92} The parties lived an upper-class lifestyle the last few years of their marriage. They built an 8,000 square foot home, which is valued at over $900,000 and spent $2,600,000 to build and furnish it. (Tr. 342.) The parties travelled widely, including trips to Cancun, Aruba, Panama City, Cozumel, Belize, New York, North Carolina, Cabo San Lucas, and two Buckeye National Championship football games. Homewood has given Dach jewelry, a wave runner, and a Karmann Ghia automobile as gifts. The parties had memberships in a vacation club, a dining club, and they assisted in the support of Dach's sister, brother, and father, as well as Homewood's mother.

Homewood testified he employs a housekeeper, ($800 per month), a landscaper ($16,000-17,000 per year including mulch), a pool maintenance person, and window washers every month ($350 per month). (Tr. 240-41; 415-17.)  They also acquired signed memorabilia from The Ohio State University and collectors' edition Jane Austen books. (Tr. 239-40.)

{¶93}  The trial court noted that Homewood testified that Dach contributed to his present earning capacity no more than any other employee and Dach disagreed with that contention. (Tr. 244.) The trial court took notice of the federal tax rate schedules and found that income Homewood paid to Dach as spousal support would be excluded from his income and included in her income. Dach admitted that she suffered no reduction in her income or earning capacity as a result of her marital responsibilities. However, Dach did argue that her relationship and divorce from Homewood negatively impact her employment prospects in that field.

{¶94}  After examining the factors and weighing the testimony and evidence, the trial court concluded that the record provides evidence for rehabilitative support because Dach has a much lower income and earning capacity than Homewood.  The court concluded that it will take time and expense for Dach to gain the level of formal education to earn a suitable income given the high standard of living the parties were accustomed to living during the marriage.

{¶95}  A trial court's decision to award spousal support will not be reversed without an abuse of discretion.  *Blakemore* at 218 .  When determining the appropriate and reasonable amount of spousal support, the trial court must consider the R.C. 3105.18(C) factors.  Among those factors are the relative earning abilities of the parties, the time and expense necessary to acquire education for appropriate employment, the consideration of the care of the minor child and the standard of living of the parties.

{¶96}  In *McClure v. McClure*, 98 Ohio App.3d 27 (2d Dist.1994), the Second District Court of Appeals stated that the trial court has discretion to award spousal support to help the spouse obtain education to gain appropriate employment, or rehabilitative spousal support.  In that case, the husband argued that the trial court abused its discretion in ordering rehabilitative spousal support to be paid for two years when the wife was able to secure employment as a legal assistant or paralegal in the past and has her own income to use towards a paralegal degree.  The Second District found

that the trial court did not abuse its discretion in ordering the payments to obtain an education and appropriate employment, and that the trial court's decision was not arbitrary or unreasonable.

{¶97}   Similarly, in *Ganz v. Ganz*, 9th Dist. No. 16285 (Jan. 5, 1994), the husband argued that the evidence did not establish a need for rehabilitative spousal support and the wife was voluntarily unemployed.  The wife was earning a degree.  The appellate court found no abuse of discretion because the trial court had considered the R.C. 3105.18(C) factors and found rehabilitative spousal support appropriate while the wife finished her educational requirements.

{¶98}   Here, the trial court examined all of the R.C. 3105.18(C) factors in depth and found that rehabilitative spousal support was both reasonable and appropriate.  The trial court specifically focused on the large disparity in the parties' incomes and the fact that Homewood has a college degree, but Dach does not.  Further, the trial court noted that Dach's income was substantially less when she was not employed at 2Checkout.com.  Dach is the primary caregiver for the parties' minor child who requires constant supervision because of her special needs.  Dach had already investigated the expense and time necessary to obtain her degree online in order to be available for the parties' child.  The trial court found that the parties lived an upper-class lifestyle.  All of these factors convinced the trial court that rehabilitative spousal support was reasonable and appropriate.

{¶99}   Given the evidence presented and that the trial court examined the  R.C. 3105.18(C) factors in depth, we do not find that the trial court abused its discretion in awarding spousal support, even rehabilitative spousal support.  The decision is not arbitrary, unreasonable or unconscionable, therefore, Homewood's fifth assignment of error is overruled.

### 4. Homewood's (Conditional) Sixth Assignment of Error

{¶100}   Homewood's sixth assignment of error is conditional and to be asserted in the event that Dach's third assignment of error is sustained.  Since we have overruled Dach's third assignment of error, we need not address this conditional assignment of error.

## E. CONCLUSION

{¶101} Based on the foregoing, all of the assignments of error raised by both parties are overruled in their entirety, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, is affirmed.

*Judgment affirmed.*

SADLER and DORRIAN, JJ., concur.

T. BRYANT, J., retired, formerly of the Third Appellate District, assigned to active duty under authority of the Ohio Constitution, Article IV, Section 6(C).